902 A.2d 366

Andrea D. WILKES, David H. Ehrenwerth and Charles K. Clark, As Trustees of the Mark E. and Myrna L. MASON Irrevocable Trust, Mark E. Mason and Myrna L. Mason,

v.

PHOENIX HOME LIFE MUTUAL INSURANCE COMPANY, A Corporation and Balanced Equities, Inc., A Corporation.

Appeal of Phoenix Home Life Mutual Insurance Company, A Corporation.

Supreme Court of Pennsylvania.

Argued Sept. 12, 2005.

Decided July 18, 2006.

592

594

John P. Edgar, Jeffrey G. Weil, Philadelphia, for Phoenix Home Life Mutual Ins. Co.

Joseph Leibowics, Robert L. Byer, Pittsburgh, David L. McClenahan, Paul Joseph Berks, for Andrea D. Wilkes, et al.

CAPPY, C.J., CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER, JJ.

## *OPINION*

Justice CASTILLE.

The primary issue on appeal is whether appellees Andrea D. Wilkes, David H. Ehrenwerth, and Charles K. Clark, trustees of the Mark E. and Myrna L. Mason Irrevocable Trust, and Mark E. Mason and Myrna L. Mason (collectively "appellees"), are barred by the doctrine of *res judicata* from bringing suit in Pennsylvania against appellant, Phoenix Home Life Mutual Insurance Company ("appellant" or "Phoenix"), due to an out-of-state class action settlement in New York. The Court of Common Pleas of Allegheny County granted summary judgment for Phoenix and dismissed appellees' suit, finding that since appellees had not opted out of a class action settlement filed in New York state court against appellant concerning the failure of some of its insurance policies to perform as promised, *res judicata* barred appellees from subsequently bringing suit against appellant in Pennsylvania on the same matter. On appeal, however, the Superior Court found that the class action notice apprising appellees of the New York settlement was constitutionally inadequate and reversed the trial court. This Court granted further review to determine the *res judicata* effect of the New York class action settlement, including the question of whether the class action settlement notice was constitutionally adequate. For the following reasons, we find that the Superior Court's decision was in error and, accordingly, we reverse that order and reinstate the trial court order granting Phoenix summary judgment.

In the late 1980s, Mark E. Mason and Myrna L. Mason ("the Masons") established a trust to purchase $7 million in

life insurance that would enable the Masons' children to pay estate taxes without having to dispose of any illiquid portion of their estate. Andrea D. Wilkes, eldest daughter of the Masons, David Ehrenwerth, lawyer for the Masons, and Charles K. Clark, accountant for the Masons (collectively "Trustees"), were selected as the trustees for the trust. The Masons desired a policy where the premiums would diminish over time and, eventually, cease altogether at Mr. Mason's retirement, a point when the Masons would welcome fewer financial obligations.

Shortly after creating the trust, the Masons contacted independent insurance agent/broker Sander Lenenberg,[1] an acquaintance of the Masons since the 1970s, to obtain such a policy. Lenenberg suggested that the Masons purchase a whole life insurance second-to-die policy from appellant called a "Survivorship Life Protector" ("SLP"), with a rider referred to as "Optionterm," that would function as annual term insurance. Appellant advertised the proposed policy with phrases such as "quick pay," "rapid pay," and "vanishing premium." Theoretically under this plan, after premium payments had been made for fifteen years, the policy would produce enough dividends and paid-up additions[2] to obviate the need for further out-of-pocket premium payments. The targeted death-benefit value of the policy at the death of the second-to-die (i.e., Mark or Myrna) was $7 million. The proposed whole life insurance portion of the policy consisted of nearly $4.1 million, with the "Optionterm" rider contributing approximately an additional $2.9 million. Based on Lenenberg's projections, the base annual premium cost for the first five years

1. For purposes of this suit, appellees allege that Lenenberg acted as an agent of Phoenix.

2. A paid-up addition is fully-paid additional insurance purchased through policy dividends.

 In essence, each year dividends are used to purchase small amounts of insurance protection for which no further premiums are needed. This additional protection can then be used to increase the death benefit payable on the policy. The cash value of these paid-up additions can also serve to reduce future premiums.
 *Helping Your Client Choose the Right Life Insurance*, 42 No. 7 PRAC. LAW. 29, 34 (1996).

would be $80,813, with the last of such payments required in 1993. The premium payments would then decline to $60,813 through 1999, and would diminish to $40,813 until the last premium payment in 2003. No premium payments would be owed after 2003. Lenenberg's projections did not illustrate any payment scenario to demonstrate what effect the first death of either Mark or Myrna Mason would have on the premiums.

In 1989, the Trustees purchased the SLP policy with the "Optionterm" rider. The policy summary showed that the face value of the whole life insurance was $4,117,647, and the "target face amount" of the "Optionterm" rider was $2,882,353. Insurance Policy Summary Schedule at 2. The total annual premium was listed at $80,813.23. *Id.* The policy also described how dividends generated by the policy could be used to reduce premiums and purchase paid-up additions. *Id.* at 9.

In 1994, the Trustees received a notice from Phoenix that the upcoming premium payment for the insurance policy was $80,813. Because the Trustees expected that the premium payments would reduce to $60,813 in 1994, Ehrenwerth wrote Phoenix inquiring about the discrepancy. Appellant responded by letter in April of that year:

> The proposals used in determining the "Quick Pay" date project dividends based on our current interest sensitive dividend scale and are neither guaranteed nor estimates of the future. Actual dividends payable may vary and will depend, to a greater extent than in the past on Phoenix Home Life's earnings on new investments.

Phoenix Letter to Trustees, April 22, 1994. The letter also provided a new illustration showing that the premium payments would last until the twenty-third year of the policy (as opposed to the fifteenth year) and decline at a slower rate than initially expected. The Trustees then contacted Lenenberg about this letter and, subsequently, appellant reissued a new illustration conforming to the original proposal from 1989. Appellant provided the Trustees with more illustrations in June of 1994 that also matched their original expectations.

None of the illustrations that appellant provided the Trustees in 1994, however, included and accounted for a first-to-die death scenario.

In January of 1995, an attorney working with Ehrenwerth's firm requested that Lenenberg review the policy and make projections that assumed dividends would be reduced by one and two percentage points. Phoenix later provided several illustrations in response to Lenenberg's inquiry on behalf of the Masons and the Trustees, but again none of the illustrations included a first-to-die death scenario. In March of 1995, Ehrenwerth contacted Lenenberg to inquire why the Trustees had received a notice stating that an additional $5,584.41 was owed on the policy, when Lenenberg had previously indicated that a payment of $60,813 would be sufficient for 1995. Because there were not enough paid-up additions in 1995 to account for the premium expenses in excess of the payment that the Trustees had made for that year, the Trustees took a loan on the policy, as suggested by Phoenix, to cover the balance due. In February and March of 1996, appellant produced additional illustrations to show how the premium payments would change if the Masons altered their out-of-pocket premium payments for a few years. Again, no death scenario was reflected in the charts provided.

In August or September of 1996, the Trustees received a notice concerning a proposed settlement of a New York state court case involving a nationwide class action against appellant, *Michels v. Phoenix Home Life Mutual Ins. Co.*, Index No. 5318–95 (N.Y. Sup.Ct. Albany Cty.1995). A cover-letter accompanied the notice, which stated that policyholders of policies purchased between 1980 and 1995 were affected, and also stated that the proposed settlement included an offset benefit for "Optionterm" policies.[3] The letter also outlined the two proposed settlement options for affected policyholders: either alternative dispute resolution ("ADR") or General Poli-

---

3. The cover letter's opening paragraph stated that: "As a Phoenix policyholder who owned an individual, traditional whole life or universal life insurance policy between 1980 and 1995, you are considered a member of the class." Cover letter for *Michels* Proposed Settlement, at 1.

cy Relief (which is what appellees ultimately received).[4] Class members were encouraged in the letter to pursue further information: "If you have questions after reviewing this information, you can reach us at a special toll-free number we have set up with class counsel to answer your questions relating to the settlement, 1–800–556–8533." Cover Letter for *Michels* Proposed Settlement, at 1. Also, the date of the final hearing to approve settlement, November 8, 1996, was provided. *Id.* at 2.

A four-page question and answer brochure was included with the class action notice and it summarized the details concerning the claims which were made in the suit and how policyholders would be affected by the settlement. The brochure explicitly noted that vanishing premium policies were implicated in the class plaintiffs' claims and that an offset for "Optionterm" policies automatically would be awarded in the settlement.[5] The "Optionterm" charge offset was delineated as follows:

Class members will automatically receive the Optionterm Charge Offset if they (1) have in-force whole life policies with Optionterm riders and (2) do not elect to submit a claim to the ADR Process. Optionterm coverage is term insurance generally paid for by dividends. In some cases, dividends may in the future be insufficient to maintain coverage, and certain out-of-pocket payments may be required. If your policy has an Optionterm rider, the Option-

---

4. The third page of the letter summarized the proposed benefits of the settlement, including: "Owners of in-force policies with Optionterm riders will *automatically receive:* **Optionterm Charge Offset**—A two-year offset of term insurance charges not otherwise covered by dividends." Cover letter for *Michels* Proposed Settlement, at 3. Accompanying information explained that this automatic relief would only be awarded if a policyholder chose the General Policy Relief at settlement, as opposed to ADR. Question and Answer Brochure for *Michels* Proposed Settlement, at 2.

5. The brochure stated that the lawsuit involved claims concerning: "How the company sold vanishing premium polices, which Phoenix called 'Quick Pay' or 'Rapid Pay' policies. Vanishing premiums is a sales concept under which policy values, rather than out-of-pocket payments, are used to pay premiums on whole life policies. . . ." Question and Answer Brochure for *Michels* Proposed Settlement, at 1.

term Charge Offset will eliminate your out-of-pocket costs during the first two years for which an out-of-pocket outlay is required. (Class members will have the option of deferring the offset to the second and third years if they wish.)

Question and Answer Brochure for *Michels* Proposed Settlement, at 3. The brochure also provided the toll-free number established by class counsel to answer questions that any policyholder had with respect to the suit.

The settlement notice provided even greater detail concerning the class action, as it stated:

The Plaintiffs make allegations concerning (i) how Phoenix made use of a method of using dividends to pay premiums on a whole life policy, or interest credited on a universal life policy, rather than paying them in cash, in order that no further out-of-pocket premium would be due after a fixed period of time, which sales concept was variously referred to as "Quick Pay" or "Rapid Pay," as well as Phoenix's use of dividends to help meet the costs of a rider known as Optionterm; (ii) the sale of life insurance by portraying it as an investment, savings, retirement or similar plan without disclosing that it is life insurance or the nature of the policy's benefits; (iii) the replacement of any existing life insurance policy with a new life insurance policy, or the sale of a new life insurance policy funded in whole or in part using an existing policy's cash value; and (iv) the failure to disclose material information in connection with the introduction of new methods for calculating dividends and crediting rates. The allegations in the lawsuits include claims that Phoenix misled policyowners in these and other circumstances.

Notice of Proposed Settlement for *Michels* Class Action, at 2. The notice warned that policyholders who failed to opt out of the settlement would be bound by its terms and policyholders in the class would be precluded from bringing any other lawsuit against appellant, specifically detailing that policyholders would be prohibited from making any claim about the number of premium payments required to keep the policy active. *Id.* at 11.

As to the benefits class members would have from the settlement, the notice explained that individuals with whole life policies would be eligible for "General Policy Relief," which could include dividend enhancements for up to four years, and the right to elect optimal premium loans through 2005. The notice also provided more detail as to how, under a General Policy Relief, offsets would be administered for policies with an "Optionterm" rider:

> The forms of relief available to class members under the proposed settlement are as follows:
>
> **1. General Policy Relief** . . . .
>
> * * *
>
> **(c) Optionterm Offsets:** Class members with in-force Policies having Optionterm riders will have an opportunity to receive the "Optionterm Offset." For all such class members, the Company will offset the out-of-pocket costs of their Optionterm riders during the first two years for which an out-of-pocket outlay is required to maintain existing levels of Optionterm coverage, unless the class member requests to delay such offset for one year. The purpose of the Optionterm Offset is to help class members maintain originally illustrated coverage that might otherwise require out-of-pocket outlay additional to that originally illustrated.

*Id.* at 6. For class members who did not believe that General Policy Relief would suffice, the ADR option was again offered and its procedures were explained in detail. *Id.* at 7–8. The toll-free number established to answer questions about the suit was provided multiple times, along with the address of counsel for the plaintiffs. None of the materials provided in the class action notice suggested that policyholders should contact the agent who sold the policy for further information about the class action.

The Masons claimed that when they received the class action notice, they contacted Lenenberg, who told them that their policy was not affected by the proposed settlement and that they should not opt out. Whether Lenenberg rendered such advice was disputed below; however, the parties agree

that the Masons remained part of the class action when the opt-out phase ended on October 18, 1996. In January and March of 1997, Phoenix provided the Masons and their Trustees, through Lenenberg, further illustrations detailing the future premium schedule payments, illustrations that closely resembled the initial payment schedule provided when the Trustees purchased the policy.

In mid-April of 1997, the Trustees received the details of the class action settlement which had been approved by the *Michels* court in an opinion dated January 3, 1997. The deadline for policyholders to choose their preferred method of relief (*i.e.*, General Policy Relief or ADR) was May 27, 1997. Appellees claimed that they again solicited Lenenberg's advice and Lenenberg advised them not to select the ADR option because their policy was not affected.[6]

On April 25, 1997, appellant internally produced another set of illustrations, unbeknownst to appellees, detailing what future premium payments would be owed in various circumstances. These illustrations included a "death scenario" which showed that if Mr. Mason died at eighty years-old, which would coincide with the twenty-first year of the policy, the out-of-pocket premium, which had vanished in the policy's thirteenth year, would return in the twenty-fourth year, when Mrs. Mason would be seventy-eight years old. To keep the policy in force through the forty-first year of its existence, in this scenario, Mrs. Mason would need to pay an out-of-pocket premium of $630,774. Appellees never received a copy of these illustrations.

In August of 1998, Mr. Mason discovered that Lenenberg was being investigated by the FBI for fraud perpetrated by misappropriating funds to himself that the Masons had paid on another insurance policy. The Masons responded by writing to appellant and requesting that a record of all transac-

6. The record reveals only that the Masons spoke with Lenenberg concerning which relief to invoke; there is no affirmative indication that the Masons returned the election form. However, it is apparent that they received General Policy Relief, which was the default if a putative plaintiff failed to opt-out or did not select ADR.

tions associated with their policy from its purchase be mailed directly to them, not via Lenenberg. On March 12, 1999, appellant sent Ehrenwerth a letter with 110 pages of illustrations, with all illustrations including the dividend enhancement benefit provided according to the General Policy Relief afforded in the class action settlement. One of the scenarios illustrated the premium payments if Mr. Mason died at age eighty-three. It showed out-of-pocket premium expenses returning in the twenty-seventh year of the policy and quickly escalating to exorbitant levels, such that the excess charge to keep the policy in force that year, in addition to the annual $80,813 premium, would be over $500,000. In that scenario, the total out-of-pocket premiums paid over the course of the policy would surpass $5 million.

Thereafter, the Trustees and the Masons filed a complaint against both Phoenix and Lenenberg's company, Balanced Equities, Inc.,[7] in March of 2000 asserting claims for breach of contract, fraud and deceit, negligent misrepresentation, reformation, violation of the Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S. § 20-1 *et seq.*, and bad faith under the Unfair Insurance Practices Act, 42 Pa.C.S. § 8371. In defense, appellant argued, *inter alia,* that the doctrine of *res judicata* barred the lawsuit, citing the *Michels* class action settlement in which the Masons had participated. The parties each filed motions for summary judgment in 2002 and, on December 23, 2002, the Honorable Judith Friedman of the Court of Common Pleas of Allegheny County granted appellant's motion on all claims. In a contemporaneous memorandum opinion, the trial court concluded that *res judicata* barred appellees' complaint as a result of the *Michels* class action because the prior settlement clearly covered the instant insurance policy. Trial court slip op. (December 23, 2002), at 1. The trial court further found that it was unreasonable for appellees to have relied on any representations that Lenenberg might have made concerning the class action's effect on

7. Appellants never served Balanced Equities as a defendant, as it was effectively out of business due to Lenenberg's fraud prosecution, conviction and eventual imprisonment.

the instant policy, stating, "[y]ou do not consult your enemy about how to interpret documents in dispute." *Id.* at 2. The trial court went on to note that if it were free to address the underlying merits of the action, the case would be ripe for resolution given that appellees had already paid premium payments higher than originally promised. The court also noted that there would be a factual dispute regarding agency; specifically, whether appellant was liable for any misrepresentations made by Lenenberg. *Id.*

The Trustees and the Masons appealed and, on February 14, 2003, the trial court issued an opinion pursuant to Pa. R.A.P.1925(a). Trial court slip op. (February 14, 2003), at 1. In this opinion, the trial court reasoned that the *Michels* class action notice and accompanying brochure conveyed in plain terms that appellees' policy was implicated in the settlement, and that it was unreasonable as a matter of law for appellees to rely on the representations of Lenenberg and appellant, especially since there was no fiduciary relationship between appellees and appellant that might justify that reliance. *Id.* at 7–9.

On appeal, a Superior Court panel reversed and remanded in a published opinion. *Wilkes v. Phoenix Home Life Mutual Ins. Co.*, 851 A.2d 204 (Pa.Super.2004). The panel began its legal analysis by articulating the elements of the *res judicata* doctrine under Pennsylvania authority, but then noted that without adequate class notice, a class member would not be prohibited by *res judicata* from re-litigating claims resolved by a prior class action settlement. *Id.* at 210. The panel found that the *Michels* class action notice did not contain an adequate description to warn the Masons that their policy was affected by the impending settlement, because nothing in the notice mentioned the "second-to-die" policy that the Masons owned or made appellees aware that a "vanished premium for a second-to-die policy including an Optionterm component could reappear and quickly escalate." Moreover, the panel found that appellees could not possibly have been aware that they had been harmed by appellant, since they did not realize

anything was wrong with their policy at the time of the *Michels* settlement. *Id.* at 212–13.

The panel analogized appellees' case against appellant to *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), which involved a challenge to class action certification for settlement purposes in an asbestos exposure case. In *Amchem Products,* the propriety of class certification, under Rule 23 of the Federal Rules of Civil Procedure, arose because the class members included both individuals experiencing asbestos-related disability and individuals who only had been exposed to asbestos, but were not yet suffering from any asbestos-related medical condition. *Id.* at 602–03, 117 S.Ct. at 2239–40. Due to the differing interests of the two groups within the class, the Court held that the plaintiffs should not have been certified as a class. *Id.* at 625, 117 S.Ct. at 2250.

The panel viewed appellees here as being akin to the exposure-only claimants in *Amchem Products.* The panel then reasoned that it would be unfair to bar appellees' suit based on *res judicata* because: (1) Phoenix and Lenenberg had made several assurances that the policy would function as the Masons were originally told it would in 1989; (2) the *Michels* notice did not convey the potentially astronomical premium payments that could become due under the SLP policy; and (3) appellant's own corporate representative admitted that the *Michels* notice contained no information concerning the potentially large out-of-pocket premium payments required for an SLP policy after the death of the first insured. The panel then proceeded to hold that the notice of the *Michels* class action settlement sent to appellees was inadequate and, therefore, precluded a grant of summary judgment for appellant based on *res judicata. Wilkes,* 851 A.2d at 213. Moreover, with respect to appellees' failure to opt out of the class action, the panel found that it was not unreasonable as a matter of law for appellees to rely on appellant's and Lenenberg's representations about the policy because appellant was the exclusive source of information concerning the policy's performance. In light of these findings, the panel reversed

the grant of summary judgment in favor of appellant, and remanded the case to the trial court for it to reconsider its holding on the issue of fraud. *Id.* at 213–14.

This Court granted appellant's Petition for Allowance of Appeal, in an order dated April 12, 2005, to resolve the following issues:

> Whether, and to what extent, the doctrine of *res judicata* bars [appellees] from bringing suit in Pennsylvania under the instant circumstances?

> Even assuming that *res judicata* bars [appellees'] underlying causes of action, whether the notice of class action settlement received by [appellees] was constitutionally adequate to fix [appellees'] rights in light of their decision not to opt out of the out-of-state class action suit?

*Wilkes v. Phoenix Home Life Mutual Ins. Co.*, 582 Pa. 434, 872 A.2d 1124 (2005) (per curiam).

On appellate review, a trial court's grant of a motion for summary judgment will only be disturbed upon a finding that a genuine issue of material fact exists or where the moving party was not entitled to such a judgment as a matter of law. *Mullin v. Commonwealth, Dep't of Transp.*, 582 Pa. 127, 870 A.2d 773, 778 (2005). In conducting our review, the record must be construed in a light most favorable to the non-moving party and any doubt as to the existence of a genuine issue of material fact must be construed against the moving party. *Id.* 778–79 (citing *Hughes v. Seven Springs Farm, Inc.* 563 Pa. 501, 762 A.2d 339, 340–41(2000)). We review pure matters of law *de novo*.

## I. *Res Judicata.*

Appellant first argues that *res judicata* bars appellees' suit because the *Michels* class action settlement is entitled to full faith and credit. Appellant claims that two other courts have already accepted this proposition in similar cases, namely, *Caputo v. Phoenix Mutual Life*, 723 A.2d 227 (Pa.Super.1998) (unpublished decision), and *Cappuccio v. Phoenix Home Life Mutual Ins. Co.*, ATL–L–PP1497–94 (N.J.Super.Feb.25, 1997)

(unpublished decision). Appellant additionally contends that appellees' suit clearly would be barred under New York's *res judicata* doctrine and that, in this case, it is New York law that should be applied.

In response, appellees do not contest that a preliminary *res judicata* test would block their present claims; rather, they combat appellant's arguments by asserting that exceptions to *res judicata* apply. We will begin by first identifying the applicable *res judicata* doctrine.

 The United States Constitution requires that full faith and credit "shall be given in each State . . . to the judicial [p]roceedings of every other State." U.S. Const. Art. IV, § 1. The Full Faith and Credit Clause thus precludes a party from attacking collaterally a judgment of one state by attempting to re-litigate the underlying dispute resolved by that judgment in another state. Thus, full faith and credit typically requires that a state give a judgment the same *res judicata* effect the judgment would have been afforded in the state in which it was rendered. *Thompson v. Thompson,* 484 U.S. 174, 180, 108 S.Ct. 513, 517, 98 L.Ed.2d 512 (1988); *Durfee v. Duke,* 375 U.S. 106, 109, 84 S.Ct. 242, 244, 11 L.Ed.2d 186 (1963).

 *Res judicata,* or claim preclusion, prohibits parties involved in prior, concluded litigation from subsequently asserting claims in a later action that were raised, or could have been raised, in the previous adjudication. *R/S Financial Corporation v. Kovalchick,* 552 Pa. 584, 716 A.2d 1228, 1230 (1998). The doctrine of *res judicata* developed to shield parties from the burden of re-litigating a claim with the same parties, or a party in privity with an original litigant, and to protect the judiciary from the corresponding inefficiency and confusion that re-litigation of a claim would breed. *Id.*

Appellees do not dispute appellant's argument that this Court's inquiry into whether *res judicata* prohibits the instant suit should begin by applying *res judicata* doctrine as devel-

oped in the New York courts.[8] This Court's precedent on the question of which jurisdiction's *res judicata* doctrine should prevail in an instance in which the prior lawsuit arose in another jurisdiction has been unclear. For example, in *Commonwealth ex. rel. McClintock v. Kelly*, 287 Pa. 139, 134 A. 514, 516 (1926), this Court applied its own *res judicata* doctrine to decide if the decision of a Maryland court should be provided *res judicata* effect. Nearly a half century later, however, this Court gave *res judicata* effect to an Ohio judgment without applying Pennsylvania *res judicata* doctrine; there we rejected a challenge to the validity of an Ohio divorce decree. *Barnes v. Buck*, 464 Pa. 357, 346 A.2d 778, 782 & n. 11 (1975). Although each opinion cites to the U.S. Supreme Court's Full Faith and Credit Clause jurisprudence, *McClintock*, 134 A. at 515–16; *Barnes*, 346 A.2d at 781, different approaches were ultimately employed in the two cases.

The divergence in view found in this Court's precedent is mirrored in the academic authority which exists on the question. Thus, some commentators have argued that the Full Faith and Credit Clause does not dictate that courts must employ the foreign state's *res judicata* doctrine in cases such as this. *See, e.g.*, Howard M. Erichson, *Interjurisdictional Preclusion*, 96 MICH. L.REV. 945 (1998) (analyzing different approaches to choice of law issue). It also has been argued that no authority precludes a state from using its own *res judicata* analysis when that state's preclusion law would give at least as much, or more, preclusive effect as the out-of-state court's law would mandate. *E.g.*, Comment, Gregory S. Getschow, *If At First You Do Succeed: Recognition of State Preclusion Laws in Subsequent Multistate Actions*, 35 VILL. L.REV. 253, 276 (1990); *see also* Gene R. Shreve, *Preclusion and Federal Choice of Law*, 64 TEX. L.REV. 1209, 1227–28 (1986) (discussing ability of federal courts to give greater

---

8. We note that, although appellees do not explicitly object to appellant's claim that New York *res judicata* law applies, and appellees devote a portion of their brief to discussing whether New York law distinguishes between extrinsic and intrinsic fraud, appellees also discuss the fraud exception as viewed by Pennsylvania courts. Appellees' Brief at 23–27.

preclusive effect to state court judgments). Finally, it has been argued that differing circumstances may warrant a court in declining to follow an immutable rule that the out-of-state's *res judicata* analysis must be used in every case. 188 ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4467 (2d ed.2002) (providing several examples of when it may be wise to depart from *res judicata* rules of out-of-state court).

On the other hand, there is ample authority weighing in favor of the proposition that the court should apply the *res judicata* law of the state that rendered the prior judgment. For example, the Restatement (Second) of Conflicts provides as follows:

> When a court has jurisdiction over the parties, the local law of the State where the judgment was rendered determines, subject to constitutional limitations, whether the parties are precluded from collaterally attacking the judgment on the ground that the court had no jurisdiction over the thing or status involved or lacked competence over the subject matter of the controversy.

RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 97 (1998). In addition, it is certainly safe to say that the U.S. Supreme Court and several state courts have generally applied the *res judicata* doctrine of the court where the judgment under collateral attack was rendered to determine if and when a collateral attack on that judgment is permissible. *See, e.g., Migra v. Warren City School District Board of Education,* 465 U.S. 75, 87, 104 S.Ct. 892, 899, 79 L.Ed.2d 56 (1984) (remanding to District Court to apply Ohio claim preclusion law); *Omega Leasing Corp. v. Movie Gallery, Inc.,* 859 So.2d 421, 424 (Ala.2003) (looking to Virginia law to determine if judgment was final); *O'Connell v. Corcoran,* 1 N.Y.3d 179, 770 N.Y.S.2d 673, 676, 802 N.E.2d 1071 (2003) (according preclusive effect to Vermont divorce decree based on Vermont's *res judicata* law); *Jordache Enters., Inc. v. Nat'l Union Fire Ins. Co.,* 204 W.Va. 465, 513 S.E.2d 692, 703 (1998) ("the full faith and credit clause generally requires the courts of this State to give the New York judgment at least the res judicata effect which it would be accorded by the New York courts"); *Smith*

*v. Shelter Mut. Ins. Co.,* 867 P.2d 1260, 1265 (Okla.1994) (applying Arkansas claim preclusion law); *Nottingham v. Weld,* 237 Va. 416, 377 S.E.2d 621, 623 (1989) (holding that Virginia courts must give federal court judgment same preclusive effect federal court would have given that judgment). *But see, e.g., Ditta v. City of Clinton,* 391 So.2d 627, 629 (Miss.1980) (applying preclusion law of Mississippi where Louisiana judgment was argued to have preclusive effect); *Finley v. Kesling,* 105 Ill.App.3d 1, 60 Ill.Dec. 874, 433 N.E.2d 1112, 1117 (1982) (declining to apply collateral estoppel rules of Indiana).

The "fog of ambiguity" to which Mr. Chief Justice Cappy adverts in his concurrence, then, is a fog that is found both in our precedent and the commentary. Since the parties do not perceive or attempt to dissipate the fog, we are satisfied, in the present case, to indicate an awareness of the issue without purporting to offer, *sua sponte,* a definitive resolution. Therefore, consistently with the manner in which the case has been briefed to us, we will proceed by analyzing whether *Michels* would bar appellees' suit under New York law.

■■■■ In New York, the doctrine of *res judicata* prohibits a party from litigating a claim where a judgment on the merits exists from a prior action between the same parties involving the same subject matter, including all claims that were litigated or could have been litigated in the prior action. *In re Hunter,* 4 N.Y.3d 260, 794 N.Y.S.2d 286, 291, 827 N.E.2d 269 (2005).[9] Where an action has reached a final conclusion, "all other claims arising out of that same transaction or series of transactions are barred, even if it is based upon different theories or if seeking a different remedy." *Id.* (quoting *O'Brien v. City of Syracuse,* 54 N.Y.2d 353, 357, 445 N.Y.S.2d

9. It bears noting that it is not self-evident that the New York test for *res judicata* is coterminous with the approach prevailing in Pennsylvania. *See In the Matter of Dennis J. Iulo,* 564 Pa. 205, 766 A.2d 335, 337 (2001) (*res judicata* bars subsequent action where "there exists an identity of issues, an identity of causes of action, identity of persons and parties to the action, and identity of quality or capacity of the parties suing or being sued.").

687, 429 N.E.2d 1158 (1981)) (internal quotations omitted).[10] A final order or judgment has been reached, under New York law, when all of the causes of action have been disposed of between the parties by the order or judgment and there is no need for further judicial action, excluding ministerial tasks. *Burke v. Crosson,* 85 N.Y.2d 10, 623 N.Y.S.2d 524, 527, 647 N.E.2d 736 (1995). Finally, the New York Appellate Division has held that a judgment approving a class action settlement agreement is a final order for purposes of *res judicata. Sound Distributing Corp. v. Ponce Acquisition Corp.,* 179 A.D.2d 469, 577 N.Y.S.2d 863 (1992).

■ Here, when appellant sold its insurance policy to the Masons, the policy employed "quick pay" terminology and appellant referenced "quick pay" in correspondence with appellees. Letter from Phoenix to Trustees, dated 4/22/94. Hence, the Masons plainly were included in the class of plaintiffs in *Michels,* a lawsuit which brought various claims against appellant involving, *inter alia,* "quick pay" policies that would use accrued dividends to help meet the premiums of an "Optionterm" rider. Of the claims summarized in the class action notice, the first expressly accused appellant of misleading policyholders with regards to:

> a method of using dividends to pay premiums on a whole life policy, or interest credited on a universal life policy, rather than paying them in cash, in order that no further out-of-pocket premium would be due after a fixed period of time, which sales concept was variously referred to as "Quick

10. To determine whether a claim is a part of the same transaction involved in a prior case, the New York Court of Appeals adopted the "transactional" test described in the Restatement (Second) of Judgments § 24(2). *See Chen v. Fischer,* 6 N.Y.S.3d 94, 100–01 (2005). Section 24(2) of the Restatement provides:

> What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

*Id.* There is no issue in the case *sub judice* that the claims appellees would now pursue are part of the same transaction that gave rise to the *Michels* class action.

Pay" or "Rapid Pay," as well as Phoenix's use of dividends to help meet the costs of a rider known as Optionterm.... Notice of Proposed Settlement for *Michels* Class Action, at 2. The *Michels* court issued an eighty-four page opinion on January 3, 1997, addressing the adequacy of the class action settlement reached between appellant and Phoenix policyholders on this, and other, claims. Appellees now seek to challenge that same settlement on various grounds by re-litigating the claim brought in *Michels* involving "quick pay," an aspect of the Masons' SLP whole life insurance policy.

Viewing these circumstances in light of New York's *res judicata* doctrine, the instant matter plainly involves the same relevant parties as the prior suit, for appellees did not opt out of the *Michels* class action, and indeed, they benefited from the settlement terms in that they were automatically entitled to receive a period of dividend enhancement, an offset of out-of-pocket premium costs for two years, and the right to elect optional premium loans through 2005. In addition, the present suit concerns the same subject matter as the class action; indeed, in both cases, the claims against appellant include allegations that it misled its policyholders into purchasing an insurance policy with the "quick pay" feature and the policy did not perform as promised. Moreover, a final judgment on the merits was rendered in *Michels,* as the New York court in that case rendered an opinion on the adequacy of the class settlement, which is deemed a final order under New York law. *See Sound Distributing Corp.,* 577 N.Y.S.2d at 863. Although appellees might take issue with the second prong of the test given their protestations, discussed *infra,* that the class action notice was inadequate because it did not explicitly mention SLP policies, that is not an allegation that would bear directly upon an element of the basic New York test for *res judicata.* And, indeed, appellees do not dispute that, absent the defective notice issue they wish to litigate, *res judicata* would bar this suit. Accordingly, in answer to the first question this Court accepted for review, we hold that appellees' suit presumptively would be barred by *res judicata* in a New York court and, consequently, we extend full faith and

credit to the *Michels* judgment by preliminarily affording it
that same preclusive effect in Pennsylvania.

## II. Adequacy of Notice.

Appellant next argues that the Superior Court erred when
it declined to give the *Michels* judgment the preclusive effect
it deserved on the separate ground of defective notice, the
defect consisting of the fact that the class action notice did not
explicitly mention the SLP policy that the Trustees managed
and the potentially astronomical premiums that might become
due in certain scenarios. Appellant asserts that this Court's
review of the adequacy of the class notice should be limited to
accepting the *Michels* court's findings on the notice's adequa-
cy, which appellant claims was extensive.

In the alternative, appellant argues that, even if this Court
were to review the class notice *de novo*, the notice was
adequate. Appellant emphasizes that the notice clearly ex-
plained that appellees would be subject to the terms of the
class settlement if they failed to opt out of it, and that all
known or unknown claims that may thereafter exist would be
precluded by the settlement. In response to appellees' claim
that the notice should have provided more information con-
cerning their specific policy, appellant counters that appellees
failed to seek further information by calling the toll-free
number provided in the *Michels* notice and in the accompany-
ing brochure. Appellant also notes the impracticality of the
Superior Court's adverse decision, as it effectively would
require that specific information pertaining to individual poli-
cies should have been disseminated to the 510,000 potential
class members who were affected in *Michels*. Appellant
submits that constitutional requirements respecting notice im-
pose a more practical and less burdensome duty: class notice
need only provide a reliable means for interested parties to
become apprised of the pending action and an opportunity to
present objections. Appellant argues that the toll-fee number
provided this necessary forum for each potential plaintiff to
learn what specific impact the class action would hold for an
individual policy. Finally, appellant argues that the fraud

alleged should not have any effect on reviewing the adequacy of the class notice because appellees had notice and an opportunity to participate in the litigation, as well as warnings that they could not bring any claims against appellant in later litigation.

In response, appellees counter with the reasoning of the Superior Court that the current case is analogous to *Amchem Products*, where some of the class action plaintiffs had not yet suffered any physical harm and, accordingly, the Supreme Court held that the plaintiffs could not properly be certified as a class under federal civil procedure rules. In support of this reasoning, appellees point to appellant's failure to notify them of the effect that a death of one, but not both, of the Masons would have on future policy premiums. Appellees argue that the Superior Court rightly found that injury to the Masons had not manifested itself at the time of the settlement, that the class notice omitted necessary information, and that appellant deliberately prevented appellees from learning of the nature of the Masons' harm under the policy. In arguing defective notice, appellees specifically emphasize the absence of any mention of SLP policies in the class notice.

With respect to appellant's argument that this Court must defer to the *Michels* court's ruling on notice adequacy, appellees assert that this Court should not accept the premise, as it would allow the class action court to predetermine the *res judicata* effect of its own judgments.[11] Appellees then summarize their position on the merits by arguing that review of the class action notice will prove it to be inadequate as to the Masons because appellant's fraud precluded appellees "from

11. Appellees preliminarily argue that appellant waived its argument that this Court must accept the *Michels* court's ruling on notice adequacy, by failing to raise the argument below. In reply, appellant disputes this contention and cites passages from its Superior Court brief. Appellant claims that since appellees failed to previously dispute the notion that full faith and credit requires us to accept the *Michels* court's ruling on notice adequacy, appellees' waiver argument is itself waived. Appellant's Reply Brief, at 12–13. Given this Court's conclusion, *infra*, that we review challenges to an out-of-state court's ruling on the adequacy of class notice *de novo*, a conclusion that accepts appellees' substantive position, it is unnecessary to pass upon appellees' waiver argument.

understanding the impact of the class action settlement on their claims." Appellees' Brief at 49.

As Chief Justice Cappy's concurrence notes, there is neither settled controlling authority nor even a consensus on the question of what level of deference a reviewing court should afford a settlement court's findings on the adequacy of class notice. The parties center their debate on two Federal Circuit Court cases. Appellant offers, and the Chief Justice prefers, the non-precedential view set forth by a single judge who authored the lead opinion in *Epstein v. MCA, Inc.*, 179 F.3d 641 (9th Cir.1999) (Opinion Announcing the Judgment of the Court), for the absolutist proposition that this Court should engage in a "limited collateral" inquiry into the procedural aspects of the *Michels* court's ruling on notice adequacy. Appellees, on the other hand, cite *Stephenson v. Dow Chemical Co.*, 273 F.3d 249 (2d Cir.2001), *aff'd in relevant part by an equally divided court*, 539 U.S. 111, 123 S.Ct. 2161, 156 L.Ed.2d 106 (2003) (per curiam), and argue that this Court should conduct a broad collateral review of the settlement court's findings. Appellees contend that, when a party argues that a court entered a judgment against it without authority, that party is entitled to *de novo* review in the collateral proceeding. Appellees' Brief at 44–50.

In *Epstein*, a class of plaintiffs challenged the adequacy of legal representation in a Delaware state court class action settlement. The plaintiffs were included in that class and did not opt out of the settlement.[12] The settlement ended shareholder challenges to a tender offer that Matsushita Electric Industrial Co. made for MCA, Inc. In a lead opinion joined by

12. *Epstein* has a lengthy procedural history. When the plaintiffs first appeared before the Ninth Circuit, the court considered whether the plaintiffs' federal claims were barred by the Full Faith and Credit Act, 28 U.S.C. § 1738. *Epstein*, 179 F.3d at 643. The court determined that the settlement released claims within the exclusive jurisdiction of the federal courts. On further appeal, however, the U.S. Supreme Court determined that the Delaware judgment was entitled to full faith and credit. *Id.* On remand to the Ninth Circuit, a divided panel determined that the Delaware judgment was not entitled to full faith and credit because it violated due process given the inadequacy of class representation. *Id.* That opinion was later withdrawn and replaced with the opinion discussed in the text above. *Id.* at 644.

neither of the two other judges on the panel,[13] Judge O'Scannlain opined that due process does not require a court to engage in "collateral second-guessing" when reviewing the settlement court's findings that support certification of a class settlement. *Epstein*, 179 F.3d at 648. Instead, Judge O'Scannlain wrote that a reviewing court should restrict itself "to consider whether the procedures in the prior litigation afforded the party against whom the earlier judgment is asserted a 'full and fair opportunity' to litigate the claim or issue." *Id.* at 648–49. Judge O'Scannlain found support for his decision in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), stating that the Supreme Court never implied that a certifying court's determination of the adequacy of representation was subject to collateral review, and cited Federal Circuit Court cases for his view that class members' due process rights are protected by the certifying court and direct appeal courts. *Id.* at 648 (citing *Grimes v. Vitalink Communications Corp.*, 17 F.3d 1553, 1558 (3d Cir.1994); *Nottingham Partners v. Trans–Lux Corp.*, 925 F.2d 29, 33 (1st Cir.1991)). Furthermore, in concurring in the result, Judge Wiggins noted that the Delaware Chancery Court had already addressed individual class member challenges to the class representatives' representation. *Id.* at 651.

The situation confronting the Second Circuit Court of Appeals in *Stephenson* two years later was markedly different. In *Stephenson*, two veterans of the Vietnam War challenged a trial court's finding that their suit against manufacturers of the defoliant known as Agent Orange was barred by a 1984 settlement brought by service members disabled by the herbicide. *Stephenson*, 273 F.3d at 251. According to the class definition in the prior settlement, both *Stephenson* veterans were included within the class because they were members of the U.S. military, stationed in Vietnam between 1961 and 1972, and were injured by their exposure to Agent Orange. *Id.* at

---

**13.** Judge Wiggins concurred in the result reached by Judge O'Scannlain and filed an opinion to explain why he changed his vote from a prior appeal. Judge Thomas dissented and filed an opinion in which he objected to Judge O'Scannlain's failure to discuss whether the plaintiffs were even members of the class.

260. The veterans had each been diagnosed with cancer in 1998, but were precluded from obtaining funds from the 1984 settlement because they had not claimed disability prior to 1994. *Id.* In a unanimous opinion, the Stephenson panel found that a party should not be foreclosed from collaterally attacking a class settlement when the party claims to have been an improper party to the settlement under attack. *Id.* at 259. The attack was permissible, according to the court, since the adequacy of representation for class members manifesting injuries after 1994 had not previously been addressed and precedent supported such a collateral attack. *Id.* at 257–58. The court quoted *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), for the proposition that class action judgments can only bind members when their interests are unified, as well as the Second Circuit's previous pronouncement that class action judgments are not secure from collateral attack unless the absent members are vigorously represented. *Id.* at 258 (citing *Van Gemert v. Boeing Co.,* 590 F.2d 433, 440 n. 15 (2d Cir.1978)).

The apparent divide between the approaches by Judge O'Scannlain and the *Stephenson* panel is likely a product of the differing tasks and factual circumstances facing the two courts. In *Epstein,* the dominant issue was the adequacy of class representation, while *Stephenson* pertained to the propriety of a class member's inclusion in the class which was subject to a prior settlement. In *Epstein,* the settlement court had already reviewed specific challenges to class counsel's representation, but in *Stephenson* the certifying and direct appeal courts had not previously addressed the interests of class members who became injured following the exhaustion of the 1984 settlement funds. Thus, the two approaches may not necessarily represent a schism in the law, so much as the reality that courts reviewing a collateral attack on a class settlement, and asked to balance judicial efficiency, finality of a judgment, and an individual's due process rights, may reasonably make different determinations in different circumstances. Class actions do promote judicial efficiency by resolving claims shared by a large number of individuals when

they are respected as final. On the other hand, we believe it unwise to adopt a prescriptive rule that would prevent going behind a class action judgment, but for procedural irregularities in that first judgment, irrespective of the specific claim forwarded. When a class member collaterally attacks a class settlement by alleging that he was wrongfully included in the class, an argument not made in *Epstein,* we believe the allegation should be permitted substantive collateral review because a class settlement does not always protect the interests of every party subject to it. *See Stephenson,* 273 F.3d at 259.

In the instant matter, the parties cite no case that specifically addresses the appropriateness and scope of collateral review when class notice is allegedly inadequate. However, the present case is sufficiently analogous to *Stephenson* to permit substantive collateral review here, as appellees' allegation (taken at face value for purposes of deciding our review paradigm) is premised on the notion that **nothing** in the class notice would have alerted them to the fact that they were inappropriately included in the class and the *Michels* court never addressed whether notice was adequate for class members with SLP policies. Inadequate notice, in fact, is a recognized exception to the effect of the *res judicata* doctrine. *See Kealoha v. Castle,* 210 U.S. 149, 155, 28 S.Ct. 684, 687, 52 L.Ed. 998 (1908). Moreover, this Court has previously noted that, in light of the requirements of due process, we are not obliged to give full faith and credit to a judgment of another state where notice was inadequate. *See Barnes,* 346 A.2d at 782 (citing *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) and RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 104 (1971)).[14] To ensure that this Court renders an

---

**14.** As the Restatement explains in a Comment, courts are not required to give judgments full faith and credit when they are rendered in violation of due process:

Due process forbids the rendition of a judgment within the United States unless the State of rendition has judicial jurisdiction (see § 24) and unless the parties have been given adequate notice and adequate opportunity to be heard (see § 25). A judgment rendered in violation of these requirements is void in the State of rendition itself, and due

independent judgment on this constitutional question, we believe that a broad collateral review of the notice is warranted for the limited purpose of assessing the appropriate *res judicata* effect. Furthermore, it is not entirely clear to us that the inquiry into adequacy of notice for class action purposes is coterminous with the inquiry into notice for purposes of *res judicata;* this is an additional reason weighing in favor of an independent review.

It is settled that notice is a fundamental requirement of due process, for a proceeding to be respected as final. *Mullane v. Central Hanover Bank Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950); *Pennsylvania Coal Mining Ass'n v. Insurance Dept.,* 471 Pa. 437, 370 A.2d 685, 692 (1971). Notice is deemed adequate when it is reasonably calculated to inform a party of the pending action and provides the party an opportunity to present objections to the action. *Mullane.* Additional requirements have been articulated for notices sent in class actions. A potential plaintiff in a class action must be:

> provided with an opportunity to remove himself from the class by executing and returning an "opt out" or "request for exclusion" form to the court. Finally, the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members.

*Phillips Petroleum Co.,* 472 U.S. at 812, 105 S.Ct. at 2974.

On several occasions, this Court has explored the specific notice requirements demanded by due process. We have explained that the approach to determining what notice is adequate must be flexible and non-technical. *Harrington v. Dep't of Transp., Bureau of Driver Licensing,* 563 Pa. 565, 763 A.2d 386, 391–92 (2000). Furthermore, we have noted that due process does not confer upon an individual the right to be deliberately obtuse to the nature of a proceeding. *See, e.g.,*

process forbids the recognition and enforcement of such a judgment in sister States (see § 92).

RESTATEMENT (SECOND) OF CONFLICTS § 104, at Comment (a).

620

*Crooks v. Dep't of Transp., Bureau of Driver Licensing,* 564
Pa. 436, 768 A.2d 1106, 1109 (2001).

 Applying these principles, we have no difficulty in
rejecting appellees' contention that the notice sent to them
concerning the *Michels* class action did not provide them with
sufficient information to comprehend the propriety of their
inclusion in that litigation. First, as previously stated the
cover-letter accompanying the notice not only stated that
policyholders who purchased policies from 1980 to 1995 were
affected, but it also mentioned that the proposed settlement
included an offset benefit for "Optionterm" policies. The
letter specifically noted a toll-free number created by class
counsel to answer questions that any policyholder had with
respect to the suit and gave the date of the final hearing to
approve settlement. Second, the four-page question and an-
swer brochure made clear that the instant insurance policy
was covered in the suit, as it stated that vanishing premium
policies were included in the plaintiffs' action, and that an
offset for "Optionterm" policies would be automatically award-
ed in the settlement. The brochure, like the letter, also
provided counsel's toll-free number for further information.
Third, as mentioned in the above discussion on *res judicata,*
the notice recounted the ways in which policyholders were
allegedly "misled" by appellant, including appellant's: (1) of-
fering policies that would use dividends to pay premiums on
whole life insurance, "in order that no further out-of-pocket
premium would be due after a fixed period of time, which sales
concept was variously referred to as 'Quick Pay' or 'Rapid
Pay,' as well as [appellant's] use of dividends to help meet the
costs of a rider known as Optionterm;" (2) sale of life insur-
ance under the guise it was an investment plan; and (3) failure
"to disclose material information in connection with the intro-
duction of new methods for calculating dividends and crediting
rates." Notice of Proposed Settlement for Michels Class
Action, at 2.

The notice also detailed that offsets would be given for
individuals owning "Optionterm" polices and that "General
Policy Relief" would be available for those with whole life

insurance policies. Furthermore, the notice advised the putative class members of their right to opt out, and cautioned members about the consequences of failing to opt out of the suit, expressly warning that policyholders would be prohibited from making **any** claim about the number of premium payments required to keep the policy active. Notice of Proposed Settlement for *Michels* Class Action, at 11. Again, the toll-free number and addresses of class counsel were listed in the body of the notice.

Considering the breadth of information provided in the *Michels* class notice, question and answer brochure, and cover-letter, appellees clearly were provided with sufficient information apprising them of the pending litigation and a means to present objections to it or to opt out. Due process requirements aside, notice is not an end in itself; in most instances, the recipient of notice must take some affirmative responsive action, whether it be investigation, a formal pleading, etc. The notice provided here alerted appellees to potential problems with their policy, that these problems involved a lack of disclosure by appellant, and that the specified circumstances in the notice were not exhaustive or exclusive. The proverbial ball was then in appellees' court, to make an assessment of their own individual circumstance, *i.e.*, to determine whether the class action adequately protected their interest. Notice is only the first step: the follow-up is generally a matter of individual responsibility. Thus, we hold that the notice in the case *sub judice* met the requirements of due process.

Moreover, we agree with appellant that the Superior Court's ruling would establish a higher due process requirement than is constitutionally necessary, at least as far as this case is concerned, in holding that the notice is constitutionally deficient for failing to specifically mention SLP polices. SLP policies were only one type of whole life insurance policy that might be adversely impacted by the vanishing premium policy option that was a primary claim in *Michels*, a claim that appellees were made amply aware of in the class notice. Due process does not require the notice to list every policy in which vanishing premiums are involved. Instead, an individu-

al of reasonable intelligence could comprehend from the *Michels* notice that if he has an insurance policy with vanishing premiums, whatever the type of underlying policy, then that policy will be affected by the class settlement and he should investigate to determine the best course in his individual circumstances. The Superior Court's approach would essentially require that the notice list every potential negative consequence of having a policy with "vanishing premiums" or "quick pay," such as the possibility for premiums to skyrocket for SLP policies. This requirement, we believe, is too burdensome—and it certainly is not required to satisfy basic notions of due process. It was sufficient to notify class members that "vanishing premium" policies were alleged by the plaintiffs in *Michels* not to operate as they were advertised.

Furthermore, we are unpersuaded by appellees' claim that fraud perpetrated by appellant precluded them from discovering the true scope of the *Michels* litigation. The class notice plainly provided appellees with the necessary information to understand that the Masons' insurance policy would be affected by the class settlement, if they failed to opt out of it, and even provided appellees with avenues to obtain further information, avenues they neglected to pursue. Simply put, the claim of external fraud forwarded here cannot make this facially constitutionally adequate notice constitutionally inadequate. We do not doubt that appellees now regret not having investigated the matter further when put on notice; but they cannot colorably claim they were unaware of the effect of their choice to surrender all claims.

Lastly, we are unpersuaded by the Superior Court's reliance on *Amchem Products*. In *Amchem Products*, the U.S. Supreme Court found that two provisions of Rule 23 of the Federal Rules of Civil Procedure prevented the putative class of plaintiffs, which included both individuals with asbestos-related disabilities and exposure-only claimants, from being certified as a single class. First, Rule 23(b)(3) requires that class members share common questions of law or fact that "predominate over any questions affecting only individual members." The Court held that the class did not meet the

predominance requirement, because exposure-only plaintiffs will incur different medical expenses for monitoring and treatment than plaintiffs already treating asbestos related diseases. 521 U.S. at 624, 117 S.Ct. at 2250. Second, the Court ruled that the putative class could not satisfy Rule 23(a)(4)'s requirement that the named parties fairly and adequately represent the class's interests, since class members currently suffering from asbestos disability would desire a immediate compensation for their injuries, whereas exposure-only claimants would be interested in preserving an ample fund for future possible expenses. *Id.* at 625, 117 S.Ct. at 2250. The Court also observed that the case raised important questions about the adequacy of class notice, but declined to rule on that issue because the class could not be certified. *Id.* at 628, 117 S.Ct. at 2252.

The Superior Court acknowledged that *Amchem Products* did not contain a holding directly related to the issue of adequate notice. *Wilkes,* 851 A.2d at 211. The panel nevertheless proceeded to find that appellees were like the exposure-only claimants in *Amchem Products,* who were unaware of their asbestos exposure and the potential health risk, because appellees "had no reason to believe they had or were being defrauded as they had received numerous assurances from Phoenix and Lenenberg that their policy coverage was as originally represented in 1989." Therefore, in the panel's view, appellees did not have the necessary information to decide whether to stay in or opt out of the class action. *Id.* at 213. But the panel's finding in this regard is contradicted by the fact that the policy premium bill for 1994 was $20,000 more than the Masons expected, policy illustrations from 1994 showed the decline of premium payments occurring at a slower rate than initially expected, and the Masons had to borrow roughly $5,500 on their policy in 1995 to account for an unexpected premium payment shortage. While it is true that at the time the Masons had to decide whether or not to opt out of the class action they were unaware of the extent to which they might be defrauded in the future, they had ample evidence that their policy was not operating as advertised at the

time the class action notice arrived. Thus, even assuming that *Amchem Products* would support a holding that class notice is deficient where it does not provide class members with sufficient information to determine whether they share in the injury alleged to have been caused by the defendant, it is of no avail to appellees here because they were given multiple indications that they had suffered the type of injury that was covered by the class action.

## III. Fraud.

Appellant's final claim is that appellees cannot succeed on a claim that fraud eviscerates the *res judicata* effect of the *Michels* judgment, unless appellees prove that class counsel in *Michels* was deceived, rather than proving fraud in relation to appellees' individual case. In the alternative, appellant argues that appellees were well aware that their policy was not operating as initially expected, they had opportunities to inquire about the class action's effect on the policy, and they never took reasonable steps to do so. Appellant argues that the only time period that is relevant to appellees' fraud claim is from August to October of 1996, during the opt-out period, since appellees only claim fraud in inducing them to fail to opt out of the class action. Appellant further contends that any improper illustrations it provided to appellees before that time are irrelevant because claims of that nature were directly addressed by the *Michels* suit. Appellant lastly asserts that any fraud after October 1996 is likewise irrelevant.[15]

In response, appellees claim that *res judicata* does not bar the instant suit due to fraud committed by appellant. Appellees contend that it is a well-settled principle that fraud permits a collateral attack on a judgment and, here, fraud occurred during the settlement of the case. Construing the

15. Because it found for appellees on the notice issue, the Superior Court did not address appellees' claim of fraud and, instead, directed the trial court on remand to reconsider the claim of fraud in light of the panel's findings on notice. *Wilkes*, 851 A.2d at 214. The fraud issue has been fully briefed here and is ripe for decision. In the interest of judicial economy, we will reach it. *See, e.g., Murphy v. Duquesne Univ. of the Holy Ghost*, 565 Pa. 571, 777 A.2d 418, 435 n. 12 (2001). The question of whether summary judgment was appropriate on the fraud claim is one of law, hence our review is plenary.

record in the light most favorable to the non-moving party, appellees argue, provides sufficient evidence for a jury to conclude that appellant defrauded them. Although Phoenix disputes that Lenenberg had an agency relationship with them, appellees claim that this relationship must be accepted as true for purposes of summary judgment. Moreover, appellees argue that appellant is not entitled to an inference that appellees were on notice of the policy defects, as appellees assert that they reasonably relied on appellant's false and misleading representations and their right to rely on these representations is a question of fact. Lastly, appellees dispute appellant's contention that they must prove fraud occurred in connection with the *Michels* class action attorneys. Appellees argue that public policy requires that courts ensure that an individual plaintiff's rights in a class action are not sacrificed by "collusive attorneys;" therefore, courts must examine claims of fraud with respect to the individual class members. Appellees also assert that it is unrealistic to expect class members to actively contact class counsel and inform counsel of a defendant's and defendant's agent's representations to a class member.[16]

■■■ If a judgment has been procured by fraud or collusion, *res judicata* will not usually be an impediment to litigating a claim anew. *Morris v. Jones*, 329 U.S. 545, 550–51, 67 S.Ct. 451, 455–56, 91 L.Ed. 488 (1947). It appears that the highest court in New York has yet to apply the generally accepted principle that fraud is an exception to *res judicata*, but it has previously noted the existence of the exception. *See Parker v. Hoefer*, 2 N.Y.2d 612, 162 N.Y.S.2d 13, 142 N.E.2d 194, 196 (1957) (stating that fraud and collusion may generally operate as an exception to *res judicata*, while summarizing U.S. Supreme Court's case law on full faith and credit, but not discussing exception in relation to case).[17] Unsurprisingly, it

16. For the purposes of this decision, we will assume without deciding that a successful fraud claim may be maintained in relation to individual class members, rather than respecting class counsel. We do so because we find, *infra*, that the claim so viewed fails as a matter of law.

17. Based on our earlier discussion concerning what state's claim preclusion law we should apply, in order to decide if the *Michels* judgment

also appears that the elements of fraud that a party seeking to re-litigate a claim must prove to gain the benefit of the fraud exception are left undefined. Considerations of comity weigh against attempting to delineate the specific boundaries of such an exception for New York and, consequently, we decline to sculpt and apply a specific fraud exception to *res judicata* here.

■■■ Rather, for present purposes, it is enough to note that we are satisfied that appellees could not successfully argue fraud as an exception to the *res judicata* doctrine in this case given New York's view of fraud cases generally. To establish a *prima facie* case of fraud in New York, one must allege a representation of a material fact, falsity, scienter, reliance, and injury. *See Small v. Lorillard Tobacco Co., Inc.,* 94 N.Y.2d 43, 698 N.Y.S.2d 615, 720 N.E.2d 892, 898 (1999). Moreover, reliance on a fraudulent misrepresentation must be reasonable. *See Hoffend & Sons, Inc. v. Rose & Kiernan, Inc.,* 19 A.D.3d 1056, 796 N.Y.S.2d 790, 791–92 (2005); *Ruffino v. Neiman,* 17 A.D.3d 998, 794 N.Y.S.2d 228, 229 (2005).

■■■ Appellees' allegation of fraud in the case *sub judice* is advanced without any attempt to apply the allegation to a known legal standard or a suggested one. Taking appellees' allegations of fraud at their essence, this Court is asked to conclude that Lenenberg's assertions as appellant's agent (a fact, which we are required to consider as true for the purposes of summary judgment) that the instant insurance policy was not implicated in the *Michels* litigation undid the effect of the contents of the class notice, question and answer brochure, and accompanying cover letter. In our view, as a matter of law, appellees cannot succeed upon a claim of reasonable reliance on Lenenberg's statements when these statements directly conflict with the text of the class notice itself. *Cf. Ruffino,* 794 N.Y.S.2d at 229 (plaintiff not entitled as matter of law to reasonably rely on misrepresentations when they directly conflict with terms of consent decree).

is entitled to full faith and credit, we analyze the present issue involving the contours of any fraud exception to the *res judicata* doctrine, under New York law.

This is particularly so considering the sophistication of Mr. Mason, a successful business person, and trustee Ehrenwerth, an experienced lawyer. Thus, even assuming that a fraud exception to *res judicata* would be accepted under New York law, we find that appellant is entitled to summary judgment on this claim.

For the foregoing reasons, we conclude that *res judicata* applies, that the class notice in this case was constitutionally adequate, and that the allegation of fraud is insufficient as a matter of law to defeat the effect of *res judicata*. Accordingly, we reverse the order of the Superior Court and reinstate the trial court's grant of summary judgment in favor of appellant. Jurisdiction relinquished.

Justice SAYLOR and EAKIN join the opinion.

Justice NIGRO did not participate in the decision of this case.

Chief Justice CAPPY files a concurring opinion.

Justice NEWMAN files a dissenting opinion in which Justice BAER joins.

Chief Justice CAPPY, Concurring.

I join the Majority Opinion in all respects save for its discussion of the purported choice of law issue regarding which state's issue preclusion law applies, as well as its treatment of the scope of review afforded to the settlement of an out-of-state class action suit.

Addressing the choice of law issue first, I see no reason to shroud the issue of which state's *res judicata* law would apply in this matter in a fog of ambiguity. *See Maj. Op.* 587 Pa. at 607–10, 902 A.2d at 376–77. In my view, Article IV, Section One of the United States Constitution, best known as the Full Faith and Credit Clause, and the pertinent jurisprudence of the United States Supreme Court, sweep away any uncertainty in this area and answer the issue definitively.[1]

1. The Full Faith and Credit Act implements the protection of the United States Constitution's Full Faith and Credit Clause. 28 U.S.C. § 1738.

The United States Supreme Court repeatedly has spoken to the purpose, policy, and function of the Full Faith and Credit Clause. The Court's view on these concepts is aptly summarized in *Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n,* wherein the Court stated:

the concept of full faith and credit is central to our system of jurisprudence. Ours is a union of States, each having its own judicial system capable of adjudicating the rights and responsibilities of the parties brought before it. Given this structure, there is always a risk that two or more States will exercise their power over the same case or controversy, with the uncertainty, confusion, and delay that necessarily accompany relitigation of the same issue. Recognizing that this risk of relitigation inheres in our federal system, the Framers provided that 'Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State.' U.S. CONST., art. IV, § 1. This Court has consistently recognized that, in order to fulfill this constitutional mandate, 'the judgment of a state court should have the same credit, validity, and effect, in every other court of the United States, which it had in the state where it was pronounced.'

455 U.S. 691, 703–704, 102 S.Ct. 1357, 71 L.Ed.2d 558 (1982) (quoting *Hampton v. McConnel,* 3 Wheat. 234, 16 U.S. 234, 235, 4 L.Ed. 378 (1818)). The Full Faith and Credit Clause therefore upholds the integrity of a decision properly rendered in one state court by affording it the same effect in a sister state's court. In *Durfee v. Duke,* the Supreme Court stayed true to this principle, stating in clear terms that "full faith and credit thus generally requires every State to give to a judgment at least the *res judicata* effect *which the judgment would be accorded in the State which rendered it.*" 375 U.S. 106, 109, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963) (emphasis supplied).

The Majority Opinion, however, claims this Court may speak to the issue of "determining which jurisdiction's *res judicata* doctrine should prevail in an instance in which the

prior lawsuit arose in another jurisdiction." *See Maj. Op.* 587 Pa. at 608, 902 A.2d at 376. I find such a claim to be at odds with not only the Full Faith and Credit Clause of the United States Constitution and applicable precedent of the United States Supreme Court, but also with the role of this Court in following the construction and interpretation of the federal Constitution. *Hall v. Pa. Bd. of Probation and Parole,* 578 Pa. 245, 851 A.2d 859, 863 (2004) ("It is beyond cavil that this Court is bound by the determinations of the United States Supreme Court on ... the construction and interpretation of the federal constitution.").

The Majority cites *Barnes v. Buck,* 464 Pa. 357, 346 A.2d 778 (1975), as an instance illustrating this Court's vacillation in this area of the law. *See Maj. Op.* 587 Pa. at 610 n. 9, 902 A.2d at 378 n. 9. Respectfully, I differ with the Majority's reading of *Barnes,* as I view the *Barnes* decision to be in harmony with the well-settled principles set forth in *Durfee. See Barnes,* 346 A.2d at 780 ("The decree of the Ohio court ... is entitled to full faith and credit in the courts of Pennsylvania ... That is, we must give it the same recognition and *res judicata* effect as it would receive in the courts of Ohio.") In *Barnes,* this Court gave proper heed to the Full Faith and Credit Clause and the United States Supreme Court's construction thereof by determining if an Ohio court would have given preclusive effect to a prior decision from an Ohio court.[2]

The Majority further supports its contention that the law is unsettled as to whether the Full Faith and Credit Clause

2. Although I agree with the Majority's point that, in *Commonwealth ex rel. McClintock v. Kelly,* 287 Pa. 139, 134 A. 514 (1926), this court used a Pennsylvania claim preclusion analysis to determine the effect of a prior Maryland decision, I do not think that *McClintock* is persuasive in illustrating this court's indecision as to which state's *res judicata* analysis applies. A close read of *McClintock* reveals that this court, like the Superior Court opinion in this matter, utilizes the Pennsylvania analysis without regard for the United States Supreme Court's Full Faith and Credit Clause jurisprudence. The *McClintock* decision, in this regard, is curious, as one of the federal cases it purports to rely upon, *Reynolds v. Stockton,* reiterates the well-settled rule in this area: "[F]ull faith and credit demanded is only that faith and credit which the judicial proceedings had in the other State in and of themselves require." *Reynolds v. Stockton,* 140 U.S. 254, 264, 11 S.Ct. 773, 35 L.Ed. 464 (1891).

requires a state to apply the res judicata rules of the state rendering the judgment by citing to a variety of academic publications.[3] These academic sources do not add anything to the inquiry in this case as they each specifically support the general principle that a state must give the same preclusive effect to a judgment as would the rendering state. Regardless of the points that they espouse, commentaries from professors and law students, however learned, can in no way diminish the fact that both the Supreme Court of the United States and of this Commonwealth, as well as a good number of courts throughout the country, have spoken clearly to this issue, holding that the Full Faith and Credit Clause requires a state to apply the res judicata principles of the state rendering the judgment. See, e.g., *Durfee v. Duke, supra,* and *Barnes v. Buck, supra.*

As it is settled that the Full Faith and Credit Clause of the United States Constitution requires this Court to utilize New York's *res judicata* analysis in determining whether the decision in *Michels v. Phoenix Home Life Mut. Ins. Co.,* No. 5318–95, 1997 N.Y. Misc. LEXIS 171 (N.Y.Sup.Ct. January 3, 1997), bars Appellees' suit, I am unwilling to characterize this as a choice of law issue. Respectfully, therefore, I reserve myself from this discrete portion of the Majority's analysis. Nevertheless, as the Majority indeed utilizes the New York *res judicata* formulation, as it must, I agree with the resolution of that facet of the opinion.

Similarly, while I agree with the result reached by the Majority with respect to Appellees' attack on the adequacy of the *Michels* settlement notice, I cannot agree with the proposition that this Court may engage in what the Majority terms a "*de novo*" review of the adequacy of the class notice in *Michels. See Maj. Op.* 587 Pa. at 613–14 n. 11, 902 A.2d at 379–80 n. 11. As the briefs in this matter reveal, there is a

3. The articles merely expound theories concerning peripheral issues such as, *inter alia,* whether a court may give a *more* preclusive effect to a judgment than the rendering state and whether a state is bound to give preclusive effect to the judgment of a federal court under the Full Faith and Credit Clause. As these articles address issues not present in this case, I am puzzled by their inclusion in the Majority's opinion.

spirited debate amongst courts and commentators regarding whether a foreign court's class action due process determination[4] is subject to collateral review in another state court. *See* Appellants Brief at 32–41; Appellees' Brief at 44–50; Appellants Reply Brief at 14–17. Our Court has not yet addressed this issue. The Majority acknowledges this divide in its summation of the parties' arguments on this issue. Nevertheless, the Majority concludes in this matter of first impression that this court may engage in a "de novo" review.

As stated above, this issue is the focus of a scholarly dispute, as well as a split among both U.S. Circuit Courts of Appeal and state appellate courts. *See, e.g., Epstein v. MCA, Inc.,* 179 F.3d 641, 648 (9th Cir.1999) (plurality opinion advocating narrow collateral review of rendering court's due process determinations); *Stephenson v. Dow Chemical,* 273 F.3d 249 (2d Cir.2001) aff'd in relevant part by equally divided court, 539 U.S. 111, 123 S.Ct. 2161, 156 L.Ed.2d 106 (2003) (permitting a merits-based attack by absent class members not specifically covered in prior determination); *Fine v. America Online, Inc.,* 139 Ohio App.3d 133, 743 N.E.2d 416, 421–24 (2000) (adopting *Epstein* ); *Hospitality Management Associates, Inc. v. Shell Oil Co.,* 356 S.C. 644, 591 S.E.2d 611 (2004) (same); *State v. Homeside Lending, Inc.,* 175 Vt. 239, 826 A.2d 997 (2003)(citing *Stephenson* with approval); Sara Mauer, Dow Chemical Co. v. Stephenson: Class Action Catch 22, 55 S.C.L.REV. 467 (2004); 18A Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 4455, at 486 (2d ed.2002) (describing the *Epstein* position as reflecting "the deeper currents that are sweeping class litigation along towards uncertain destinations" and warning that *Epstein's* "new view ... must confront many problems").

4. Due process determinations by a class action court are those which the United States Supreme Court has deemed necessary to bind absent class members. *Phillips Petroleum v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (holding that notice, opportunity to be heard, a right to opt out, and adequate representation are necessary to bind absent class members to the judgment of the rendering class action court).

Appellants, on the one hand, advocate this Court to follow the *Epstein* line of decisions and thus limit Appellees' ability to collaterally attack the *Michels* court's ruling with respect to the adequacy of the class action notice approved by the New York court. According to *Epstein,* collateral second-guessing by courts outside of the original forum is inappropriate. Review by a second court under the *Epstein* model is limited to determining "whether the procedures in the prior litigation afforded the party against whom the earlier judgment is asserted a full and fair opportunity to litigate the claim or issue." *Epstein,* 179 F.3d at 648–49. Under this view, absent class members' due process rights are not protected by collateral review in a second court, but rather by the initial certifying court, direct appeal within that state's courts, and, ultimately, the United States Supreme Court. *Id.* at 648, citing *Grimes v. Vitalink Communications Corp.,* 17 F.3d 1553, 1558 (3d Cir.1994). The Ninth Circuit thus has held that "where the certifying court makes a determination of the adequacy of representation in accord with *Shutts* this determination is not subject to broad collateral review." *Epstein,* 179 F.3d at 648. As acknowledged by the South Carolina Supreme Court in *Hospitality Management,* important policy reasons support this limited type of review:

It would run counter to the class action goals of efficiency and finality to allow successive review of issues that were, in fact, fully, and fairly litigated. Moreover, second guessing the fully litigated decisions of our sister courts would violate the spirit of full faith and credit.

*Hospitality Management Associates, Inc. v. Shell Oil Co.,* 591 S.E.2d at 620 citing *Fine,* 743 N.E.2d at 421.

Appellants claim the *Michels* court engaged in an extensive, in-depth analysis of the adequacy of due process protections, particularly with respect to the adequacy of the class notice. *See Michels,* 1997 N.Y. Misc. LEXIS 171, at *38–*54. Indeed, *Michels* recited the standard set forth in *Shutts,* and, after detailing the facts surrounding the adequacy of the notice provided therein, found "[t]he content and method of notice thus constituted due, adequate and reasonable notice to all

Class Members and satisfied the requirements of due process, [New York's statute] and the Rules of this Court." *Id.* at \*49–\*50.

Conversely, Appellees advocate the approach adopted in *Stephenson,* which holds that a subsequent court may engage in broad collateral review of due process determinations of the prior court. *See Stephenson,* 273 F.3d at 257–61. Appellees contend they are permitted to engage in a collateral attack on the *Michels* court determination that the notice was inadequate because of Phoenix's alleged fraud, and consequently, Appellees were never aware of any claims they may have had until after the opt-out period and after the relief made available under the Settlement Agreement was no longer available. Appellees argue that the *Stephenson* court found the notice inapplicable to the absent plaintiffs in that matter because the prior courts never made a due process determination targeted to them and therefore they were entitled to collaterally attack the due process determination. Appellees argue they are similarly situated to the absent plaintiffs in *Stephenson,* and therefore, the *Michels* determination on the adequacy of class action notice was not binding upon them.

The instant parties demonstrate their awareness and understanding of this schism. For example, Appellants dedicate several pages of their briefs to explaining the significance of the *Epstein* rationale and its adherents (*See* Appellants' Brief at 33–35; Reply Brief at 12–17); while Appellees' take lengths in diminishing *Epstein* and emphasizing the *Stephenson* rationale. (*See* Appellees' brief at 44–50). The Majority's approach is in accord with the approach espoused in *Stephenson.* Like *Stephenson,* the Majority engages in a broad, merits-based, or as it terms a *"de novo"* review of the notice question. I, however, would support a limited collateral review of this issue, one that comports with *Epstein.* The Majority attempts to support its approach by diminishing the instructive value of the Epstein opinion, claiming that it is but the "non-precedential view set forth by a single judge who authored the lead opinion in *Epstein.*" Maj. Op. 587 Pa. at 615, 902 A.2d at 380. To the contrary, the rationale underly-

ing the *Epstein* opinion has been discussed and recently adopted by the courts of two sister states. *Hospitality Management Associates, Inc. v. Shell Oil Co.*, 356 S.C. 644, 591 S.E.2d 611 (2004); *Fine v. America Online, Inc.*, 139 Ohio App.3d 133, 743 N.E.2d 416, 421–24 (2000).

The Majority further attempts to weaken the instructive value of *Epstein* in this case by asserting that it and *Stephenson* may "not necessarily represent a schism in the law" but rather, the two cases are products "of the differing tasks and factual circumstances facing the two courts." See, Maj. Op. 587 Pa. at 617, 902 A.2d at 382. To the contrary, courts and commentators view *Epstein* and *Stephenson* as espousing two contradictory legal tests as to the level of collateral attack permissible on a class action judgment:

> Thus it remains an open, and hotly litigated, question as to whether limited collateral review is required on the *Shutts* due process requirements in a class action case (*see Epstein III*), or whether a broader, merits-oriented collateral review is permitted (*see Stephenson*). In addition to the conflict in the federal circuits as exemplified by *Epstein III* and *Stephenson*, there is also disagreement amongst state courts and legal scholars.

*Hospitality Management*, 591 S.E.2d at 619. As there is a split in the law and this is a matter of first impression for this Court, our decision will have far-reaching consequences. I believe that the narrow review espoused by *Epstein* upholds the very principles underlying class action litigation, efficiency and finality, while also promoting judicial economy and comity with our sister states. As such, I believe that this Court's holding should be in line with this approach.

Consistent with the *Epstein* approach, I would look to whether the *Michels* court adopted and followed adequate procedures to ensure that the due process rights of the absent plaintiffs were protected. The *Michels* court indeed engaged in an exhaustive review of the adequacy of the class notice, one that, in many respects, parallels that of the Majority. Because I am satisfied that the *Michels* court adopted the appropriate procedures for ensuring the due process rights of

absent class members were protected, I am not willing to engage in collateral second-guessing. By this statement however, I am not subscribing to the view that a rendering court in a class action suit can insulate itself from review with a summary conclusion that the due process concerns were satisfied. In my view, the rendering court must engage in a substantive analysis of whether the rendering court established and employed the appropriate procedural safeguards in order for the absent plaintiffs to be bound by the determinations of the rendering court. If the rendering Court employed such an analysis, its determination should not be second-guessed by another court.

Given that the *Michels* court engaged in such an analysis, and my belief that limited collateral review is consistent with the spirit of the class action mechanism and the Full Faith and Credit Clause, I would find the *Michels* determination on the adequacy of the class notice to be binding upon Appellees. While the result I independently reach on this issue is similar to that of the Majority, I disassociate myself with the rationale underlying the Majority's conclusion in this regard.

Justice NEWMAN, Dissenting.

I respectfully dissent from the Opinion of the Majority. In particular, I find that based on the facts involved in the present matter, Appellees could prove fraud at trial and, as such, the doctrine of *res judicata* does not apply.

Two issues frame my discussion. First, this is a summary judgment proceeding. Therefore, we must review the record "in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Payne v. Dep't of Corr.,* 582 Pa. 375, 871 A.2d 795, 800 (2005); *Pappas v. Asbel,* 564 Pa. 407, 768 A.2d 1089, 1095 (2001). Second, it is well-established that the doctrine of *res judicata* does not apply where fraud may be found. *Morris v. Jones,* 329 U.S. 545, 550–51, 67 S.Ct. 451, 91 L.Ed. 488 (1947). "Where fraud is found, the party that used fraud should be deprived of the benefit of the judgment and any inequitable advantage gained.

Courts should not forfeit truth for the sake of finality...."
*Leber–Krebs, Inc. v. Capitol Records,* 779 F.2d 895, 901 (2d
Cir.1985) (internal citation omitted); *see also In re Aegis
Realty Corp.,* 301 B.R. 116 (Bankr.2003) (holding that, pursu-
ant to New York law, a judgment of a court having jurisdiction
of the parties and of the subject matter operates as *res
judicata* only in the absence of fraud or collusion); *Bedrock
Servs. v. Int'l Bhd. of Elec. Workers Local Union Nos. 238,
342, 495,* 285 F.Supp.2d 693, 698 (W.D.N.C.2003) (noting that,
without fraud or collusion, a judgment of a court having
jurisdiction over the parties and over the subject matter
operates as *res judicata* ). Further, a judgment is not binding
on a class member where notice of the class action settlement
was inadequate. *See Phillips Petroleum Co. v. Shutts,* 472
U.S. 797, 811–12, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (citing
*Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306,
314–15, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). Such inadequate
notice may be a result of the continued fraudulent acts of one
party towards another specific party.

### *Fraud*

My differences with the Majority center on the fraud alleg-
edly committed by Appellant and its agent, Sander Lenenberg
(Lenenberg), which makes the doctrine of *res judicata* inappli-
cable to the instant matter. The Majority states the standard
as follows:

> To establish a *prima facie* case of fraud in New York, one
> must allege a representation of a material fact, falsity,
> scienter, reliance, and injury. *See Small v. Lorillard To-
> bacco Co., Inc.,* 94 N.Y.2d 43, 698 N.Y.S.2d 615, 720 N.E.2d
> 892, 898 (1999). Moreover, reliance on a fraudulent misrep-
> resentation must be reasonable. *See Hoffend & Sons, Inc.
> v. Rose & Kiernan, Inc.,* 19 A.D.3d 1056, 796 N.Y.S.2d 790,
> 791–92 (2005); *Ruffino v. Neiman,* 17 A.D.3d 998, 794
> N.Y.S.2d 228, 229 (2005).

Maj. Op. 587 Pa. at 626, 902 A.2d at 387. The Majority then
goes on to misapply the test to the facts of this situation. In
fact, the discussion and application of this test to the facts is

cursory and consists of one paragraph dismissing the claim of Appellee.

The factual background governs the case *sub judice* and, as a result, I come to a different conclusion. The issue of which jurisdiction's *res judicata* doctrine should apply was not explicitly granted by this Court and was not briefed in full by both parties. Moreover, as noted by the Majority Opinion, this issue has not been fully addressed by this Court. Ultimately, I agree with both the Majority and Chief Justice Cappy that we shall apply that of New York as both parties argued the issue on that basis. *Id.* at 587 Pa. at 608, 902 A.2d at 376. I do not make a final judgment on the legal merits of the issue as to do so would be mere *dicta.*[1] Perhaps most importantly, the choice of law question is irrelevant in my final analysis, as fraud is clearly present in the facts as alleged. Consequently, to engage in a purely theoretical discussion concerning *res judicata* would be to remove focus from the egregiousness of the acts allegedly committed by the insurance company and its agent in this case. Further, I agree with the Majority's discussion of the scope of collateral review by this Court of the sufficiency of notice and its adoption of the approach in *Stephenson v. Dow Chemical,* 273 F.3d 249 (2d Cir.2001), 539 U.S. 111, 123 S.Ct. 2161, 156 L.Ed.2d 106 (2003) (permitting a merits-based attack by absent class members not specifically covered in prior determination). Howev-

1. Mr. Chief Justice Cappy opines that, "[i]n *Durfee v. Duke,* the Supreme Court stayed true to this principle, stating in clear terms that 'full faith and credit thus generally requires every State to give to a judgment at least the *res judicata* effect *which the judgment would be accorded in the State which rendered it.*' 375 U.S. 106, 109, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963) (emphasis supplied)." Concurring slip Op., C.J. Cappy, at 2. Further, his analysis of the Full Faith and Credit Clause of the U.S. Constitution, U.S. Const, art. IV, § 1, accurately summarizes the history and importance of such a clause. *Id.* (citing *Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n,* 455 U.S. 691, 703–04, 102 S.Ct. 1357, 71 L.Ed.2d 558 (1982) (quoting *Hampton v. McConnel,* 3 Wheat. 234, 16 U.S. 234, 235, 4 L.Ed. 378 (1818))). Although his discussion is well-written and is a persuasive argument concerning the choice of *res judicata* doctrine, I cannot join it at this time because it is not properly before us. Again, as discussed *infra,* because fraud is found in the record as viewed in the light most favorable to Appellees, the matter should not be precluded or governed by the *res judicata* doctrine.

er, irrespective of which approach is used, that of the Concurring Opinion of Chief Justice Cappy, adopting *Epstein v. MCA, Inc.*, 179 F.3d 641, 648 (9th Cir.1999) (plurality opinion advocating narrow collateral review of rendering court's due process determinations), or that of the Majority using *Stephenson*, in the end, both the *res judicata* doctrine and the related review of adequate notice contain fraud exceptions to allow for full review of a claim settled in another jurisdiction.

In *Michels v. Phoenix Home Life Mut. Ins. Co.*, Index No. 5318–95 (N.Y. Sup.Ct. Albany Cty.1995), the court addressed neither Appellees' allegations of fraud nor their factual scenario concerning ongoing fraud. Appellees' claim is highly factually specific, has not been addressed, and, if viewed in the light most favorable to Appellees as the non-moving party, vitiates the adequacy of the notice given because of the actions taken by Appellant to convince Appellees to ignore the otherwise potentially adequate notice.[2] Most important to our ability and need to review *de novo* the adequacy of the notice, no substantive review could have taken place regarding the adequacy of notice specific to Appellees.

As noted by the Majority:

[T]he present case is sufficiently analogous to *Stephenson* [*v. Dow Chemical Co.*, 273 F.3d 249 (2d Cir.2001)] to permit substantive collateral review here, as appellees' allegation (taken at face value for purposes of deciding our review paradigm) is premised on the notion that **nothing** in the class notice would have alerted them to the fact that they were inappropriately included in the class and the *Michels* court never addressed whether notice was adequate for class members with SLP policies. Inadequate notice, in fact, is a recognized exception to the effect of the *res judicata* doctrine. *See Kealoha v. Castle*, 210 U.S. 149, 155, 28 S.Ct. 684, 687, 52 L.Ed. 998 (1908). Moreover, this

---

**2.** In addition, I would err on the side of allowing review of the decision of another jurisdiction when it is possible that fraud, a different issue, or any other material difference exists. In particular, every care should be taken by this Court to protect the rights of Pennsylvania citizens and, thus, full review given where it either is or may be warranted.

Court has previously noted that, in light of the requirements of due process, we are not obliged to give full faith and credit to a judgment of another state where notice was inadequate. *See Barnes,* 464 Pa. 357, 346 A.2d [778], [] 782 [(Pa.1975)] (citing *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) and RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 104 (1971)). To ensure that this Court renders an independent judgment on this constitutional question, we believe that a broad collateral review of the notice is warranted for the limited purpose of assessing the appropriate *res judicata* effect. Furthermore, it is not entirely clear to us that the inquiry into adequacy of notice for class action purposes is coterminous with the inquiry into notice for purposes of *res judicata;* this is an additional reason weighing in favor of an independent review.

Maj. Op. 387 Pa. at 618–19, 902 A.2d at 382–83 (footnote omitted). The fraud alleged in the case before us goes towards both the general fraud exception to the *res judicata* doctrine as well as the constitutionality of the notice. *See Morris, supra; Mullane, supra.* Accordingly, I turn to those facts I deem relevant.

The first problems came to the attention of Appellees in the sixth year of the policy, 1994, when the premium due was not reduced from $80,813.00 to $60,813.00. Accordingly, a trustee of Appellees wrote to Appellant on January 28, 1994, and asked for confirmation of the reduced premium and for assurances that the policy was still in full effect.

At that time, Appellant sent a new illustration showing that the premiums would decline more slowly than in the original policy illustration and that expiration of the premiums would not occur in the sixteenth year of the policy but, instead, in the twenty-third year. Importantly, and apparently discounted by the Majority, is the fact that no death scenario was included in the illustrations. Appellees again contacted Appellant's agent, Lenenberg,[3] about the inconsistency, and a new set of illustra-

3. I note that a dispute exists concerning the status of Lenenberg; namely, whether he is an Agent of either Appellant or Appellee or both. However, as discussed above, this is in the summary judgment phase,

tions was produced in April of 1994 showing the original payment schedule and the premium payments vanishing in the sixteenth year of the policy. Again, no death scenario was included.

Yet another set of illustrations was run in June of 1994 and provided to Appellees. Once again, the important factor is that no death scenario was included. In January 1995, a lawyer for Appellees reviewed the policy with Lenenberg and asked for an updated projection based on decreased dividends. As a result, in February of 1995, Appellant again supplied new premium schedules with reduced dividends and did not include a death scenario with the illustrations.

The following year, in February and March of 1996, Appellant supplied additional illustrations regarding varied premium payments but once more failed to include a death scenario. As such, Appellees understandably assert that they were led to believe that the original premium schedule would remain in effect regardless of the death of one party. However, Appellant had internal documents showing that it set the rates on the policy to reflect the dramatic change in actuarial status when one of the Masons died. Those rates were not disclosed to Appellees, and the information provided to them did not show that, if Mark Mason predeceased Myrna Mason, the previously vanished premiums would not only reappear but also escalate far beyond the original $80,813.00 premium.

In August or September of 1996, Appellees received notice of a proposed settlement of a nationwide class action brought in New York state court against Appellant. *See Michels v. Phoenix Home Life Mut. Ins. Co.*, Index No. 5318–95 (N.Y. Sup.Ct. Albany Cty.1995). The notice itself did not clearly

we must review the record "in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Payne v. Dep't of Corrections*, 582 Pa. 375, 871 A.2d 795, 800 (2005); *Pappas v. Asbel*, 564 Pa. 407, 768 A.2d 1089, 1095 (2001). Accordingly, I will address Lenenberg as the agent of Appellant until further notice. *Accord* Maj. Op. 587 Pa. at 596 n. 1, 902 A.2d at 369 n. 1 ("For purposes of this suit, appellees allege that Lenenberg acted as an agent of [Appellant] ).''

implicate Appellees' policy; instead, it included a four-page question-and-answer brochure that summarized the details concerning the claims made in the suit and how policyholders would be affected by the settlement. The brochure did explicitly note that vanishing premium policies were involved in the claim and that a settlement would include an offset for "Optionterm" policies. As quoted by the Majority, that offset provided:

> Class members will automatically receive the Optionterm Charge Offset if they (1) have in-force whole life policies with Optionterm riders and (2) do not elect to submit a claim to the ADR Process. Optionterm coverage is term insurance generally paid for by dividends. In some cases, dividends may in the future be insufficient to maintain coverage, and certain out-of-pocket payments may be required. If your policy has an Optionterm rider, the Optionterm Charge Offset will eliminate your out-of-pocket costs during the first two years for which an out-of-pocket outlay is required. (Class members will have the option of deferring the offset to the second and third years if they wish.)

Maj. Op. 587 Pa. at 599–600, 902 A.2d at 371 (citing Question and Answer Brochure for *Michels* Proposed Settlement at 3). A toll-free number was given if a policyholder wished to talk to class counsel concerning his or her policy in relation to the suit.

The notice of settlement provided further notice:

The Plaintiffs make allegations concerning (i) how Phoenix made use of a method of using dividends to pay premiums on a whole life policy, or interest credited on a universal life policy, rather than paying them in cash, in order that no further out-of-pocket premium would be due after a fixed period of time, which sales concept was variously referred to as "Quick Pay" or "Rapid Pay," as well as Phoenix's use of dividends to help meet the costs of a rider known as Optionterm; (ii) the sale of life insurance by portraying it as an investment, savings, retirement or similar plan without disclosing that it is life insurance or the nature of the policy's benefits; (iii) the replacement of any existing life

insurance policy with a new life insurance policy, or the sale of a new life insurance policy funded in whole or in part using an existing policy's cash value; and (iv) the failure to disclose material information in connection with the introduction of new methods for calculating dividends and crediting rates. The allegations in the lawsuits include claims that Phoenix misled policy owners in these and other circumstances.

*Id.* at 600, 902 A.2d at 371–72 (citing Notice of Proposed Settlement for *Michels* Class Action at 2). In addition, policyholders were warned about the preclusion of certain claims if they chose not to opt out of the settlement. "The notice warned that policyholders who failed to opt out of the settlement would be bound by its terms and policyholders in the class would be precluded from bringing any other lawsuit against appellant, specifically detailing that policyholders would be prohibited from making any claim about the number of premium payments required to keep the policy active." *Id.* (citing Notice of Proposed Settlement for *Michels* Class Action at 11).

The Majority properly notes that the notice advised class members that they could opt out of the settlement until October 18, 1996, and thus not be bound by the settlement terms. Moreover, no recommendation was made to call the agent who sold the policy. *Id.* at 601, 902 A.2d at 372. Appellees, however, did not contact the class action attorneys. Rather, they contacted Lenenberg, who falsely advised them that their policy was not affected and told them not to opt out of the class action. As a result, Appellees did not opt out. Thereafter, Appellant continued to provide Appellees with policy illustrations showing the same coverage as that originally represented in 1989.

In April of 1997, Appellees received a second notice indicating that class members who had not opted out of the *Michels* class action could either accept General Policy Relief or, if they believed that they could provide evidence of misrepresentation, could invoke an alternative dispute resolution (ADR) process. Appellees again contacted Lenenberg, who, for a

second time, falsely advised them not to invoke ADR because their policy was not affected. "In January and March of 1997, Phoenix provided the Masons and their [t]rustees, through Lenenberg, further illustrations detailing the future premium schedule payments, illustrations that closely resembled the initial payment schedule provided when the [t]rustees purchased the policy." *Id.* at 602, 902 A.2d at 372.

In my mind, great weight should be given to the fact that Appellant internally produced another set of illustrations including a "death scenario" showing that if Mr. Mason died at eighty years old the out-of-pocket premium that had previously vanished would return in the twenty-fourth year. The internal illustration also provided that, in order to keep the policy in effect, Mrs. Mason would need to pay up to $630,774.00 in additional out-of-pocket premiums. The Majority glosses over this internal representation and the fact that for several years Appellees had repeatedly requested documentation regarding their policy and were given false or incomplete illustrations each time. This illustration was prepared approximately one month prior to the deadline for invoking the Alternative Dispute Resolution (ADR) option in the class action suit but never given to Appellees. As such, it is unclear how Appellees would know that misrepresentation had occurred and that they should pursue the ADR option as all information relevant to their specific policy was in the control of Appellant.

At this point in time, Appellants, through both the illustrations and representations of Lenenberg, had misrepresented material facts, including whether Appellees' policy was covered in the suit, the premium structure, and the hidden or non-disclosed scenario of death of one of the insured. Such representations were explicitly false or were reasonably relied upon to draw a false conclusion concerning Appellees' policy. The actions alleged were knowing in nature and made for the purpose of having Appellees reasonably rely upon the false information and directly resulted in an injury to Appellees of their inability to be fully compensated or opt-out of the settlement. *See Small v. Lorillard Tobacco Co., Inc.,* 94

N.Y.2d 43, 698 N.Y.S.2d 615, 720 N.E.2d 892, 898 (1999) (outlining factors governing fraud). Thus, Appellees have established a prima facie case of fraud pursuant to the alleged facts.

In August of 1998, Appellees learned for the first time that the FBI was investigating Lenenberg for fraud, which included Lenenberg diverting to himself substantial premiums that Mark Mason had paid for insurance with another insurance company. Upon learning this, Appellees wrote directly to Appellant and requested a complete history of all transactions concerning the insurance policy from its inception. On March 12, 1999, Appellees received from Appellant a letter with 110 pages of attached illustrations. All of the illustrations indicated that the policy was covered by the class action settlement, and some of the illustrations showed death scenarios with vanished premiums returning. This was the first time that Appellant provided illustrations revealing that vanished premiums would return upon the death of one spouse and, under certain likely scenarios, would rise to exorbitant levels totaling up to $5,000,000.00 of total out-of-pocket premiums. Armed with this new information and the freshly provided illustrations, Appellees commenced the present suit alleging both breach of contract and, importantly for the *res judicata* argument, fraud.

The crux of Appellant's argument is that the Superior Court violated the Full Faith and Credit clause of the United States Constitution by failing to afford the *Michels* settlement and judgment *res judicata* effect and by reviewing *de novo* the adequacy of the class notice provided by the *Michels* court. Specifically, Appellant argues that the *Michels* court made express findings that the class notice satisfied minimal due process requirements, as required pursuant to *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), and that the Superior Court violated the Full Faith and Credit clause and statute, 28 U.S.C. § 1738, by disregarding that finding. *See Michels v. Phoenix Home Life Mut. Ins. Co.,* No 95/5318, 1997 WL 1161145 (N.Y.Sup.Ct. Jan.07, 1997).

Appellant further asserts that, even if *res judicata* does not bar Appellees' underlying causes of action, the class notice provided by the *Michels* court was constitutionally adequate. Appellant maintains that the class notice fully informed Appellees of their rights and responsibilities as members of the class and of the details of the judgment and settlement. According to Appellant, the Superior Court erred by requiring the class notice to be narrowly tailored to Appellees' specific claims including the increased premiums upon the death of one of the insured.

Appellees counter that the class notice provided by Appellant was insufficient to enable them to make an informed decision about whether to opt out of the *Michels* class action. According to Appellees, Appellant defrauded them and attempted to obfuscate their injuries rather than notify them of their rights.

As the Superior Court panel noted, the appropriate threshold question in a case such as that *sub judice* is whether Appellees' suit is barred, in fact, by the doctrine of *res judicata*. *See Wilkes,* 851 A.2d at 210 (quoting *Taylor v. Shiley, Inc.,* 714 A.2d 1064, 1066 (Pa.Super.1998)). However, where the initial lawsuit was in the nature of a class action, a plaintiff otherwise estopped by *res judicata* will not be barred from suing individually if the notice received by the plaintiff of the class action suit was not adequate to satisfy the constitutional demands of due process. *See Phillips Petroleum,* 472 U.S. at 811–12, 105 S.Ct. 2965.

The threshold issue of whether *res judicata* barred the instant action was never fully addressed by either the trial court or the Superior Court. The doctrine of *res judicata* bars repetitious litigation of the same cause of action. As we have stated, application of this doctrine requires that the lawsuits possess the following common elements: (1) identity of issues; (2) identity of causes of action; (3) identity of persons and parties to the action; and (4) identity of the quality or capacity of the parties suing or sued. *Safeguard Mut. Ins. Co. v. Williams,* 463 Pa. 567, 345 A.2d 664, 668 (1975).

However, a judgment procured by fraud is generally not entitled to *res judicata* or full faith and credit. *See Morris v. Jones,* 329 U.S. 545, 550–51, 67 S.Ct. 451, 91 L.Ed. 488 (1947). "Where fraud is found, the party that used fraud should be deprived of the benefit of the judgment and any inequitable advantage gained. Courts should not forfeit truth for the sake of finality. . . ." *Leber–Krebs, Inc. v. Capitol Records,* 779 F.2d 895, 901 (2d Cir.1985) (internal citation omitted).

Here, the facts of the case reveal that the judgment rendered against Appellees in the *Michels* class action was procured by fraud. Upon receiving notice of the *Michels* action, Appellees contacted Appellant's agent, Lenenberg, who on two separate occasions falsely advised Appellees not to invoke ADR because their policy was not affected. Moreover, during this same time period, Appellees received numerous assurances from Appellant and Lenenberg that their policy coverage was as originally represented in 1989 and would not be affected by the *Michels* action. I am not swayed by the Majority's statement that "[t]he trial court further found that it was unreasonable for appellees to have relied on any representations that Lenenberg might have made concerning the class action's effect on the instant policy, stating, '[y]ou do not consult your enemy about how to interpret documents in dispute.'" Maj. Op. 587 Pa. at 604, 902 A.2d at 374 (quoting Trial ct. slip Op. at 2). In particular, Appellees did not only rely on the statements of Lenenberg, who it should again be stated could be considered a dual-agent and not one of the enemy, but on the illustrations provided by Appellant. These are not interpretative matters but a clear allegation of fraud related to the disclosure of information held only by Appellant.

If proved at trial, such deliberate false representations to absent class members concerning their rights and options would clearly negate any boilerplate notice provided by Appellant in the *Michels* settlement. Accordingly, in light of Appellant's allegedly fraudulent misrepresentations, the class action settlement and release in *Michels* does not preclude the present action filed by Appellees.

## *Notice*

Even if we ignore the fraudulent behavior of Appellant and assume that *res judicata* bars Appellees' underlying causes of action, a review of the facts shows that the notice of the class action settlement received by Appellees was not constitutionally adequate to fix Appellees' rights in light of their decision not to opt out of the out-of-state class action suit.

Adequate notice of a class action settlement is required by the constitutional mandate of due process. *See Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314–15, 70 S.Ct. 652, 94 L.Ed. 865 (1950). As this Court has previously stated, notice is "the most basic requirement of due process." *Coal Mining Ass'n v. Ins. Dep't.,* 471 Pa. 437, 370 A.2d 685, 692 (1977). To satisfy due process, notice of a class action settlement must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane,* 339 U.S. at 314, 70 S.Ct. 652.

The Superior Court concluded that the trial court erred in granting Appellant's motion for summary judgment because a question of fact existed as to whether, under all of the circumstances of this case, the notice provided to Appellees was constitutionally adequate.

[N]othing in the class action notice specifically referred to second-to-die policies, or to the possibility that a vanished premium for a second-to-die policy including an Optionterm component could reappear and quickly escalate.

Neither did anything in the notice disclose that after the two years of Optionterm Charge Offset had been funded by Phoenix, policyholders such as Appellants with a second-to-die policy could have to pay millions of dollars of out-of-pocket payments to maintain sufficient Optionterm coverage to meet a target amount of insurance projected, sold, and repeatedly illustrated even during the opt-out phase of the class action as requiring no out-of-pocket payment whatsoever.

¶ Significantly, Phoenix's own corporate designee, Robert Lautensack, admitted in his deposition that nothing in the class action notice provided specific information to enable the Masons and the Trustees to make an informed decision with respect to claims concerning out-of-pocket premiums required after the death of the first insured:

Q. I've already asked you this but I want to be sure it is covered, because it is one of the specific items in the corporate notice.

You indicated that there's no specific information within the class action notice to enable the plaintiffs-to make the Masons and trustees to make an informed decision with respect to claims concerning out-of-pocket premium payments required after the death of the first insured under the policy, is that correct?

A. That is correct.

(Deposition of Robert Lautensack, 10/30/01, at 189–90 (Exhibit F to Memorandum In Support of Plaintiffs' Motion for Summary Judgment, Vol. I) (R.R. 697a).) Paul Michael Fischer, Phoenix's Vice President of Life and Annuity, similarly testified that he did not recall the issue of out-of-pocket premiums due upon the death of the first insured being part of the settlement. (Deposition of Paul Michael Fischer, 6/28/02, at 219 (Exhibit D to Memorandum In Support of Plaintiffs' Motion for Summary Judgment, Vol. I) (R.R. 560a).)

*Wilkes,* 851 A.2d at 212. The Superior Court properly noted that, by Appellant's own admission, the notice was not complete with regard to either death scenarios or the escalating premiums. Coupled with the fraud demonstrated above, it defies common sense to determine that Appellees had adequate notice.

In addition, at the time of the *Michels* settlement, Appellees had no reason to believe they had been or were being defrauded because they had received numerous assurances from Appellant and Lenenberg that their policy coverage was as originally represented in 1989. Moreover, all records sent by

Appellants concealed the true nature of Appellees' policy.[4] The Superior Court described the present situation in a logical manner considering the nature of this matter is one of summary judgment:

> [T]here was at least a question of fact regarding the adequacy of the notice, and it was not unreasonable as a matter of law for them to rely on Phoenix's representations under the circumstances, where they had an ongoing business relationship with Phoenix relating to the policy, Phoenix was the only source of information concerning their policy, and Phoenix was specifically obligated to provide information about the class action by the terms of the settlement.

*Id.*

At the very least, because a question exists regarding the role of Lenenberg and the allegedly fraudulent and concealing activities undertaken by Appellant, the matter should not be dismissed at the summary judgment level and Appellees should be allowed to proceed to trial and attempt to prove fraud on the part of the insurance company. Specifically, Appellant and Lenenberg continued to provide Appellees with illustrations that showed the policy premiums vanishing, which was consistent with the policy's original explanation. Meanwhile, around the same time, Appellant was generating internal projections for the policy that showed exorbitant premiums upon the death of one beneficiary; yet it chose not to inform Appellees of these illustrations. Appellees did not know that this aspect of their policy varied from their original discussions and request for coverage. Nor did they have any reason to doubt the veracity of Appellant's and Lenenberg's representations until over one year after the period for invoking ADR ended. Appellant and its agent deliberately kept Appellees ignorant of their situation. As such, Appellees did not have the information or foresight needed to decide, intelli-

4. In relation to the choice of law between New York and Pennsylvania, should the standards differ, I would be hesitant to apply a lesser protection standard to Pennsylvania citizens when it comes to protection from fraud.

gently, whether to stay in or opt out of the *Michels* class action or whether the notice of settlement applied to them.

Accordingly, I agree with the Superior Court that the trial court erred in granting Appellant's motion for summary judgment because a question of fact exists as to whether, considering all of the circumstances of this case, the notice given to Appellees was constitutionally adequate.

### Conclusion

As the doctrine of *res judicata* does not apply in cases where fraud may be found, such fraud is currently alleged, and that fraud vitiates an already questionable notice, I would affirm the Superior Court. As such, I would remand to the trial court and allow the matter to proceed past the summary judgment stage and allow Appellees the opportunity to prove the alleged fraud.

Justice BAER joins this dissenting opinion.