The **PENNSYLVANIA STATE UNIVERSITY, Petitioner**

v.

**PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 14, 2009.
Decided Jan. 22, 2010.

Thomas T. Niesen, Harrisburg, for petitioner.

Lawrence F. Barth, Asst. Counsel, Harrisburg, for respondent.

John F. Povilaitis, Harrisburg, for intervenor, West Penn Power Company.

BEFORE: McGINLEY, Judge, and COHN JUBELIRER, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge McGINLEY.

The Pennsylvania State University (PSU) petitions for review of the order of the Pennsylvania Public Utility Commission (PUC) which adopted the Recommended Decision of the Administrative Law Judge's (ALJ) denial of PSU's Petition for Declaratory Order to apply an extended generation rate cap for service to PSU's University Park campus (University Park) under the Tariff[1] 37 account.

PSU is a major generation, transmission and distribution service customer of West Penn Power Company, d/b/a Allegheny Power (Allegheny Power) at University Park. PSU received service to University Park under the Tariff 37 account.[2] PSU is the only customer receiving service under the Tariff 37 account. Definitive Form Brief for Petitioner The Pennsylvania State University (PSU Brief) at 11. All other customers receive retail electric service from Allegheny Power under Tariff 39

---

1. Section 102 of the Public Utility Code (Code), 66 Pa.C.S. § 102, defines "tariff" as "[a]ll schedules of rates, all rules, regulations, practices, or contracts involving any rate or rates, including contracts for interchange of service, and, in the case of a common carrier, schedules showing the method of distribution of the facilities of such common carrier."

2. The electric service purchased by PSU from Allegheny Power for use at University Park served numerous purposes:

   6. ... It provides electricity to the hundreds of housing units on campus that serve as residential facilities to the students.... It also provides electricity to the office, research, instructional and administrative buildings that house professors, support staff and other persons affiliated with the campus, to the University's [PSU's] recreational facilities including Beaver Stadium and the Bryce Jordan Center, and the University's [PSU's] information technology, communication and safety notification systems.

   Petition of the Pennsylvania State University for Declaratory Order, December 3, 2007, No. 6 at 3–4; Reproduced Record (R.R.) at 14a–15a.

accounts, which also includes additional PSU service locations.[3]

## I. Procedural History

### A. 1998 Restructuring Settlement

In 1998, Allegheny Power submitted a restructuring filing to the PUC pursuant to the Electricity Generation Customer Choice and Competition Act (Competition Act).[4] Under the terms of the 1998 Restructuring Settlement, first, Allegheny Power's generation rate caps[5] were extended for three additional years beyond the statutory rate cap period from the end of 2005 through the end of 2008 for all Allegheny Power customers. Second, the 1998 Restructuring Settlement established stranded costs payment obligations for customers and Allegheny Power recovered $670 million in stranded costs[6] through a reconcilable surcharge that was to expire at the end of 2008. The extension and stranded costs obligations applied to both Tariff 37 and Tariff 39 accounts. At that time PSU was an intervenor to the Allegheny Power restructuring proceeding and a signatory to the 1998 Restructuring Settlement.

In 1999, PSU and Allegheny Power negotiated a stranded cost settlement agreement consistent with Section 2808(b) of the Competition Act, 66 Pa.C.S. § 2808(b). Under this agreement a customer was provided with the statutory option of voluntarily paying off its stranded or competitive transition charge (CTC) obligation.[7] The Competitive Transition Charge Buyout (CTC Buyout) accelerated PSU's monthly payment of its stranded cost liability with a reduced interest rate. PSU made its final payment under the CTC Buyout agreement in August 2003. PSU continued to receive generation service at a capped rate after its final payment.[8]

---

3. PSU also received generation, transmission and distribution service from Allegheny Power under Tariff 39 accounts "for approximately 100 additional accounts at the University Park campus and campuses at New Kensington, Fayette and Mont Alto." Petition of The Pennsylvania State University for Declaratory Order, No. 8 at 4; R.R. at 15a.

4. 66 Pa.C.S. §§ 2801–2812. The Competition Act was enacted in December 1996 and became effective January 1, 1997.

5. A generation rate cap caps the generation costs component of an electric user's total charge for receiving electric service. When generation rates are capped the generation cost component may not exceed a specified price. Rate caps were established in exchange for utilities being able to recover their transition or stranded costs from ratepayers.

6. Section 2803 of the Competition Act, 66 Pa.C.S. § 2803, defines stranded or transition costs as:

An electric utility's known and measurable net electric generation related costs, determined as a net present value basis over the life of the asset or liability as part of its restructuring plan, which traditionally would be recoverable under a regulated environment but which may not be recoverable in a competitive electric generation market and which the commission [PUC] determines will remain following mitigation by the electric utility.

7. Section 2803 of the Competition Act defines CTC as "[a] nonbypassable charge applied to the bill of every customer accessing the transmission or distribution network which (charge) is designed to recover an electric utility's transition or stranded costs as determined by the commission [PUC] under Section 2804 (relating to standards for restructuring of electric industry) and 2808 (relating to competitive transition charge)."

8. As explained by the ALJ:

[P]ursuant to Section 2808(b), Allegheny [Power] and Penn State [PSU] agreed to an alternative payment methodology whereby Penn State [PSU] accelerated its Tariff 37 payments for stranded costs and CTC obligations. The benefit for the University [PSU] was a lowered carrying charge. All customers were to pay 11 % interest. However, that rate was lowered to 6.5% in the CTC Buyout Agreement which required the

The CTC Buyout agreement, however, did not modify the terms of the 1998 Restructuring Settlement regarding the generation rate cap for the Tariff 37 account which was set to expire at the end of 2008.

### B. 2003 Petition to Extend the Stranded Cost Recovery Period

On November 25, 2003, Allegheny Power filed a Petition and Request for Expedited Action (2003 Petition) which sought authorization from the PUC to extend the stranded cost recovery period beyond December 31, 2008, which was the planned end point of Allegheny Power's stranded cost recovery period and generation rate cap as set forth in the 1998 Restructuring Settlement. Allegheny Power projected that the stranded costs for Tariff 39 accounts would not be fully collected by the end of 2008. Allegheny Power represented that it expected a short fall of more than $157 million in the recovery of its stranded costs by the end of 2008, absent an extension. Allegheny Power Exh. No. GBB-2 at 2; R.R. at 482a. The 2003 Petition, which sought the extension of the stranded costs recovery period, did not request a generation rate cap extension.

Allegheny Power's stranded costs recovery request was met with opposition from other customers because the customer's generation rate protection would not be continued through 2009 and 2010 while Allegheny Power continued to recover stranded costs. In September 2004, the Office of Consumer Affairs (OCA), the Office of Small Business Advocate (OSBA), and the West Penn Power Industrial Power, as intervenors, argued that generation rate cap protection contained in the 1998

Restructuring Settlement, which also initially approved the stranded costs recovery period, was needed to continue if stranded costs were recovered later than 2008.

### C. 2004 Petition to Extend the Generation Rate Cap

The parties to the 2003 Petition proceeding reached a settlement which was proposed to the PUC. The proposed 2004 Joint Petition For Settlement And For Modification of the 1998 Restructuring Settlement (2004 Petition), unlike the 2003 Petition, proposed an extension of Allegheny Power's generation rate cap. The 2004 Petition permitted Allegheny Power to extend its stranded cost recovery period for an additional two years through 2010 in return for a companion two year extension of Allegheny Power's generation rate cap. Allegheny Power Exh. No. GBB–3; R.R. at 514a. The 2004 Petition also preliminarily required notice to the parties in the 1998 Restructuring Settlement and to Allegheny Power customers.

As a result, Allegheny Power included a bill insert that outlined the 2004 Petition terms in its September 30 to October 28, 2004, customer billing cycle. The notice stated that the "proposed settlement would have the following effect" on the generation rate cap of Allegheny Power customers: "Generation rate protection through generation rate caps, which was to end in 2008, will be extended for two years until the end of 2010 to all customers. The generation rate caps for all customers increases each year between 2006 and 2010 to specified levels." PSU Exh. No. 1; R.R. at 283a.

University [PSU] to complete its prepayments by or during August 2003.... The benefit for the Company [Allegheny Power] was that it recovered all of its stranded costs attributable to Tariff 37 by August 2003, as opposed to December 2008....

The Opinion of the PUC, September 11, 2008, adopting the ALJ Recommended Decision, July 28, 2008, (PUC Opinion adopting ALJ Recommended Decision) at 24; R.R. at 1056a.

Additionally, the full text of the 2004 Petition was published in the *Pennsylvania Bulletin* on September 25, 2004. Allegheny Power Exh. No. GBB–4; R.R. at 596a. The text referred to specific proposed rates in an Appendix A that would be applicable to customers as new capped generation rates for 2009 and 2010. *The listed rate schedules in Appendix A were limited to Tariff 39 accounts.*

D. *Amended Joint Petition for Settlement And For Modification Of The 1998 Restructuring Settlement (2005 Settlement)*

On May 11, 2005, the PUC issued an Order that approved the 2005 Settlement which referenced a Revised Appendix A where it extended the stranded cost recovery and modified a capping for Allegheny Power's generation rates for 2009 and 2010.[9]

## II. Current Controversy

### A. *Petition for Declaratory Order*

On December 3, 2007, PSU filed a Petition for Declaratory Order with the PUC and sought a declaration that the extension of Allegheny Power's generation rate cap from the end of 2008 through 2010, pursuant to the May 11, 2005, Order,[10] applied to electric generation service provided to PSU at University Park under the Tariff 37 account as well as to customers under Tariff 39 accounts. Without capped generation rate protection, PSU alleged that it would be exposed to increased market prices for electric generation for 2009 and 2010 for approximately $9.2 million per year. PSU Exh. No. 1 at 10; R.R. at 77a.

Allegheny Power filed an answer and new matter and requested the PUC to dismiss PSU's Petition for Declaratory Order. Allegheny Power argued the May 11, 2005, Order, which approved the 2005 Settlement, extended the generation rate caps through 2010 for specific rate schedules for Tariff 39 accounts because Allegheny Power was under-collecting its stranded costs for customers serviced under Tariff 39 accounts. Therefore, PSU's rate cap under the Tariff 37 account was not extended under the May 11, 2005, Order. PSU replied to Allegheny Power's New Matter. The OSB and the OCA intervened.

### B. *Petition for Default Service Procurement Plan*

On January 21, 2008, Allegheny Power filed a Petition with the PUC for approval of a Default Service Procurement Plan (DSPP Petition) to establish the terms and conditions under which Allegheny Power would supply Provider of Last Resort (POLR) service to PSU's University Park campus under the Tariff 37 account for 2009–2010 if PSU did not obtain generation service from a PUC-licensed competitive electric generation supplier. The proposed DSPP Petition was based upon Allegheny Power's assertion that the restructuring transition period and generation rate cap for the Tariff 37 customers account expired on December 31, 2008.

PSU filed an Answer and a Petition to Intervene on February 8, 2008, and a Protest to the DSPP Petition on March 10, 2008. PSU again stated that the extended generation rate cap approved by the PUC

9. The 2005 Settlement was submitted to the PUC to address Allegheny Power's recognized stranded cost under-recoveries, but it did not modify the 2004 Petition terms regarding the CTC recovery and generation rate cap extension. The 2005 Settlement was neither included in customer bill inserts nor published in the *Pennsylvania Bulletin*. Allegheny Power, however, did immediately issue a press release.

10. Again, the PUC's May 11, 2005, Order adopted the 2005 Settlement.

in the May 11, 2005, Order also applied to service rendered by Allegheny Power to University Park under the Tariff 37 account. PSU argued that the issue concerning the extension of the generation rate caps under Tariff 37 account needed to be initially determined because if the rate cap extensions applied, there was no need to determine the issue of default service supply for PSU at University Park for 2009 and 2010.

The PUC consolidated PSU's Petition for Declaratory Order with Allegheny Power's DSPP Petition.[11] On June 18 and 19, 2008, evidentiary hearings were held before the ALJ.

### C. The PUC's Decision

The PUC addressed the consolidated proceeding at a public meeting on September 11, 2008.

In the PUC's September 11, 2008, Order, the PUC "concur[ed] with the ALJ's reading of the May 11, 2005 Order" and "adopt[ed] the ALJ's recommendations . . .",[12] and determined that "PSU failed to demonstrate that . . . [the two year generation] rate cap has been, or should be extended" to the Tariff 37 account. Pennsylvania Public Utility Commission, Opinion and Order (PUC Opinion 9/11/2008),

September 11, 2008, at 23; R.R. at 1105a. The PUC denied PSU's Petition for Declaratory Order and declined PSU's request to extend Allegheny Power's generation rate cap for service to University Park under the Tariff 37 account. The PUC agreed with the ALJ that PSU had adequate notice of the 2003 Petition proceedings. The PUC held that Allegheny Power provided PSU with several notices of the 2003 Petition proceeding, which included notice in the *Pennsylvania Bulletin* and the customer bill inserts that the rate cap extension did not apply to the Tariff 37 account.

### D. Petition For Reconsideration and Petition For Review

On September 26, 2008, Allegheny Power filed a Petition for Reconsideration of the September 11, 2008, Order and requested that the PUC reconsider a finding related to notice provided to PSU. Specifically, Allegheny Power alleged that it mailed documents pertaining to the 2003 Petition proceedings to a law firm that represented PSU. PSU filed an answer in opposition. On October 16, 2008, the PUC granted reconsideration concerning Allegheny Power's notice argument, pending further review and consideration of the merits.[13]

---

**11.** PSU and Allegheny Power entered into a Joint Stipulation providing for a provisional DSPP for service under the Tariff 37 account to University Park should the PUC deny PSU's Petition for Declaratory Order and conclude that the generation rate cap extension does not apply to service to University Park. September 11, 2008, Order, Joint Stipulation, R.R. at 1078a.

**12.** The ALJ issued a Recommended Decision dated July 28, 2008, which recommended that the PUC deny PSU's Petition for Declaratory Order, that the PUC approve a provisional Joint Stipulation executed by PSU and Allegheny Power and that Allegheny Power's DSPP Petition, as modified by the Joint Stipu-

lation, be approved in part and denied in part.

**13.** On October 14, 2008, PSU filed a petition for review with this Court of the PUC's September 11, 2008, Order. On November 5, 2008, this Court struck PSU's petition for review as inoperative pursuant to PA.R.A.P. 1701(b)(3), which provided:

A timely order granting reconsideration under this paragraph shall render inoperative any such notice of appeal or petition for review of a quasijudicial order theretofore or thereafter filed or docketed with respect to the prior order. The petitioning party shall and any party may file a praecipe with the prothonotary of any court in which such

On December 4, 2008, the PUC addressed the merits of Allegheny Power's Petition for Reconsideration at a public meeting. On December 9, 2008, the PUC granted Allegheny Power's Petition for Reconsideration, in part, as to clarification of portions of the September 11, 2008, Order.[14] Last, the PUC reaffirmed the September 11, 2008, Order, "in all other respects" in that it was to remain "in full force and effect," which included its rejection of PSU's request for a generation rate cap extension for service under the Tariff 37 account. PUC Opinion 12/9/08 at 9; R.R. at 1132a.

On January 6, 2009, PSU filed a petition with this Court for review of the September 11, 2008, and December 9, 2008, Orders. Allegheny Power, OSBA and the OCA intervened in the proceeding.

### III. Whether The Rate Cap Extension Was Applicable To The Tariff 37 Account?

■ Initially PSU contends [15] that the May 11, 2005, Order, which included a two-year generation rate cap, also extended to PSU's University Park under the Tariff 37 account.[16] This Court must disagree.

Specifically, the ALJ rejected this argument:

*Because PSU had already paid its Tariff 37 stranded cost obligation [under the alternative CTC Buyout agreement] before the 2003 Petition was filed, the 2003 Petition was logically oriented only to the Tariff 39 customers.* [The 2003 Petition, in its original form, initially only requested to extend the time period for recovering stranded costs to the end of 2010 for those] .... customers who would be subject to continued stranded costs payments. The [subsequent] settlement process added the extension of the [generation] rate caps. *Given that the original [2003] Petition only concerned Tariff 39 customers, it was entirely logical that the [generation rate cap] extension was limited to those customers as well* .... When the parties agreed and signed the 2004 Joint Petition, they included Appendix A which listed the rate schedules which would be subject to the cap extension. *Not surprisingly, the ... rates were listed with no reference to Tariff 37.* (Emphasis added).

---

an inoperative notice or petition is filed or docketed and the prothonotary shall note on the docket that such notice or petition has been stricken under this rule. Where a timely order of reconsideration is entered under this paragraph, the time for filing a notice of appeal or petition for review begins to run anew after the entry of the decision on reconsideration, whether or not that decision amounts to a reaffirmation of the prior determination of the trial court or other government unit. No additional fees shall be required for the filing of the new notice of appeal or petition for review.

**14.** *The PUC clarified that although Section 1.54 and 1.55 of the PUC's regulations, 52 Pa.Code §§ 1.54 and 1.55, required service upon a party when that party was not represented by counsel, Allegheny Power was not required to serve PSU with a copy of the 2003*

*CTC Petition at the time it was filed or with subsequent settlement documents. The PUC explained that PSU was a non-party to the proceedings and as a result, Allegheny Power was not required to serve PSU at all.* Pennsylvania Public Utility Commission, Opinion and Order, December 9, 2008, (PUC Opinion 12/9/08) at 8–9; R.R. at 1131a–1132a.

**15.** This Court's review is limited to a determination of whether an error of law was committed, whether necessary findings of fact were supported by substantial evidence, or whether constitutional rights were violated. *City of Philadelphia v. Pennsylvania Public Utility Commission,* 702 A.2d 1139, 1143, n. 15 (Pa.Cmwlth.1997).

**16.** This Court has foregone the sequence of PSU's arguments.

PUC Opinion adopting ALJ Recommended Decision, at 23; R.R. at 1069a.

Further, Allegheny Power points out to this Court that the Tariff 37 account was not included in its competitive Request–for–Proposals (RFP) process, "which was initiated to obtain generation [service] from certain Tariff 39 rate schedules in 2009 and 2010 under the terms of the Commission [PUC]-approved [1998 Restructuring] settlement.... [N]owhere within the service types to be served under the RFP ... is Tariff 37 identified as qualifying for load service." Final Form Brief for Intervenor West Penn Power Company, July 20, 2009, at 23.

Consequently, this Court must conclude that the PUC correctly found in its September 11, 2008, and December 9, 2008, Orders, there was no basis for PSU's proposition that the generation rate cap for the

Tariff 37 account had been, or should have been, extended under the May 11, 2005, Order, which approved the 2005 Settlement which limited its application to Tariff 39 accounts.[17]

## IV. Whether The Generation Rate Cap Should Be Extended until December 31, 2010, Under The Tariff 37 Account Pursuant To The Competition Act?

■ PSU next contends that pursuant to Section 2804(4)(ii) of the Competition Act, 66 Pa.C.S. § 2804(4)(ii), the generation rate cap under the Tariff 37 account should be extended from December 31, 2008, until December 31, 2010, because PSU will not have a choice of an alternative electric supplier.[18]

Section 2804(4)(ii) of the Competition Act provides:

---

17. PSU also raises two alternative arguments concerning the PUC's May 11, 2005, Order, which adopted the 2005 Settlement.

First, PSU argues that if the PUC intended to exclude the two year generation rate cap extension from applying to the Tariff 37 account then it would have expressly stated so in its May 11, 2005, Order. This argument is without merit.

Here the record is clear that the rate schedules affected by the proposed rate cap extension applied only to the Tariff 39 accounts and not the Tariff 37 account. *See* Revised Appendix A (only the schedules for Tariff 39 accounts were listed). Revised Appendix A neither mentions the Tariff 37 account nor lists generation rate caps for that account. Obviously, PSU was aware, or should have been aware, that the Tariff 37 account was not included.

Second, PSU argues that the savings clause included in the May 11, 2005, Order specially stated that "[t]he provisions of the 1998 Restructuring Settlement and the Commission [PUC] Orders remaining thereto shall remain applicable except as *specifically amended* in the proceeding pursuant to this [2005] Amended Joint Petition." Allegheny Power Exhibit No. GBB–5 at 628a. (Emphasis added). PSU argues that pursuant to the savings

clause the extension of the generation rate cap from December 31, 2008, until December 31, 2010, as set forth in the May 11, 2005, Order, also applied to the Tariff 37 account. However, the savings clause in the May 11, 2005, Order was not applicable. The PUC's May 11, 2005, Order, neither expressly addressed nor specifically amended or modified the December 31, 2008, expiration date for the generation rate cap for the Tariff 37 account. The reason is that Allegheny Power had already recouped its stranded recovery costs pursuant under the Tariff 37 account when it entered into an agreement with PSU to pre-pay those costs in exchange for a reduced interest rate. Therefore, since the May 11, 2005, Order did not affect the generation rate cap expiration date for the Tariff 37 account, the generation rate cap under the Tariff 37 account expired on December 31, 2008, pursuant to the terms of the 1998 Restructuring Settlement.

18. PSU argues that an available, competitive generation market was a pre-requisite for PSU to enter the competitive supply market. PSU contends that the development of a competitive market required the participation of a sizeable portion of Allegheny Power's 700,000 customer base which would not occur until after 2010.

(ii) In addition to the rate cap set forth in subparagraph (i), *for a period of nine years from the effective date of this chapter or until an electric distribution utility is no longer recovering its transition or stranded costs through a competitive transition charge or intangible transition charge and all customers of an electric distribution utility can choose an alternative provider of electric generation, whichever is shorter,* the generation component of a utility's charges to customers who purchase generation from the utility, including the competitive transition charge and intangible transition charge, shall not exceed the generation component charged to the customers that has been approved by the commission [PUC] for such service as of the effective date of this chapter. (Emphasis added).

The PUC adopted the ALJ's determination that Section 2804(4)(ii) of the Competition Act was not applicable to the current controversy:

Penn State [PSU] misread Section 2804(4)(ii) [of the Competition Act]. . . .

. . . .

The University [PSU] emphasized that the . . . language [in Section 2804(4)(ii) ] held open the rate caps for all customers until Allegheny [Power] was 'no longer recovering' its stranded costs and until all customers could 'choose an alterative provider of electric generation. . . .' Penn State [PSU] asserted that, because there was no current alternative suppliers in the Allegheny [Power] service territory, the second requirement could not be met until a market formed after the rate cap expired at the end of 2010. . . .

. . . .

I find that the language of the statute is more properly construed as authorizing rate caps for the *shorter* of two time measurements: The first measure was nine years. The second was until an electric distribution utility was no longer recovering its transition or stranded costs through a competitive transition charge or intangible transition charge AND all customers of an electric distribution utility could choose an alternative provider of electric generation. Given that nine years [past the January 1, 1997, effective date of the Competition Act] ended in December 2005, I find that this section of the statute is not applicable to the current fact pattern and not supportive of the Penn State [PSU] argument. (Emphasis in original).

PUC Opinion adopting ALJ Recommended Decision at 26–27; R.R. at 1058a–1059a.

■ Where a statute is free and clear from ambiguity the plain language controls. 1 Pa.C.S. §§ 1903, 1921; *O'Rourke v. Commonwealth Department of Corrections,* 566 Pa. 161, 778 A.2d 1194 (2001). Here, the plain language of Section 2804(4)(ii) of the Competition Act addresses two scenarios, contrary to PSU's interpretation. Under PSU's interpretation the rate caps for all customers must stay in place for nine years or until the stranded costs are recovered *and* all customers are able to choose an alternative supplier. PSU's interpretation equalizes the two time periods which is inconsistent with the statutes' intent to authorize rate caps for "whichever is shorter" of the two time periods. Consequently, this Court is of the opinion that the ALJ and PUC applied the proper construction of the statute.

■ However, PSU asserts that the failure to extend the generation rate cap to the Tariff 37 account was discriminatory. Specifically, PSU asserts that it would pay a higher rate while other similarly situated customers would pay a lower rate. This assertion is specious.

Section 2804(7) of the Competition Act, 66 Pa.C.S. § 2804(7), provides that "[t]he commission [PUC] shall require that restructuring of the electric utility industry be implemented in a manner that *does not unreasonably discriminate against one customer class to the benefit of another.*" (Emphasis added).

Additionally, Section 1304 of the Code, 66 Pa.C.S. § 1304, provides:

No public utility shall, as to rates, make or grant any unreasonable preference or advantage to any person, corporation, or municipal corporation, or subject any person, corporation, or municipal corporation to any unreasonable prejudice or disadvantage. *No public utility shall establish or maintain any unreasonable difference as to rates, either as between localities or as between classes of service.* (Emphasis added).

This Court concurs with the ALJ determination that PSU's exclusion from the rate cap extension under the Tariff 37 account was not discriminatory:

I disagree with the University's [PSU's] arguments that equity and fairness favor the grant of the cap extension to Tariff 37. Penn State [PSU] entered into the CTC Buyout Agreement with the knowledge that the Tariff 37 rate cap would expire at the end of 2008. At the risk of some repetition, both sides got what they bargained for in a private agreement: Penn State [PSU] got a lower interest rate, and Allegheny [Power] got its stranded costs payments faster. In this instance the main campus [under the Tariff 37 account] will not get the cap extension, but the other 100 [Tariff 39] accounts will. Penn State [PSU] got the benefit of those other 100 accounts without any action on its part. *I find that it was treated as fairly as all of the other Tariff 39 customers who got the cap extension without appearing in the 2003 Petition case.* Chapter 28 of the Public Utility Code does not require all customers to have the same rate cap expiration date....

....

Section 2808(b)[19] authorized the Commission [PUC] to extend the CTC recovery period for good cause. Good cause existed in the 2003 Petition case when the Company [Allegheny Power] demonstrated that it was underrecovering its stranded costs from selected Tariff 39 customers.... Section 2808(b) is silent on the issue of extending rate caps. However, the May 11 Order approved the settlement offered by the parties in the [2005] Amended Joint Petition because the settlement offered extended rate caps to the affected customers and was judged to be in the public interest. At the risk of continued repetition, *there was no underrecovery of Tariff 37 stranded costs and no reason for the commission [PUC] to act gratuitously in favor of Penn State [PSU], particularly when Penn State [PSU] failed to intervene. Any alleged discrimination suffered by the University [PSU] was*

---

**19.** Section 2808(b) of the Competition Act, 66 Pa.C.S. § 2808(b), provides:

(b) Period for collecting competitive transition charges.—The competitive transition charge shall be included on bills to customers for a period not to exceed nine years from the effective date of this chapter unless an alternative payment methodology is mutually agreed upon by the customer and the utility *or unless the commission [PUC]* *in its discretion and for good cause shown orders an alternative payment period.* In establishing the length of the period for collection for the competitive transition charge, the commission [PUC] shall consider the effect on the ability of the Commonwealth to compete in attracting industry and jobs, on the financial health of electric utilities and other relevant factors. (Emphasis added).

*attributable to its own inaction.* (Emphasis added).

PUC Opinion adopting ALJ Recommended Decision at 28–29; R.R. at 1060a–1061a.

In conclusion, all parties were treated equally. First, under the Tariff 39 accounts Allegheny Power was granted a two year extension to recover its stranded costs and the customers, including PSU, received a two year rate cap extension. Second, *under the Tariff 37 account Allegheny Power had already recouped its stranded costs and PSU received a lower interest rate concerning those costs which had resulted in substantial savings to PSU.*

Therefore, this Court must conclude that the PUC properly found that all customers were treated fairy and equally and as a result there was no legal basis supporting PSU's allegation of discrimination concerning the extension of the generation rate cap under the Tariff 37 account.

## V. Whether PSU Was Adequately Notified That The Rate Cap Extension Would Not Apply To University Park Under The Tariff 37 Account?

█ Last, PSU contends it was denied the opportunity to have the new generation rate cap extension apply to the Tariff 37 account at the 2003 Petition proceeding and as a result, it was denied due process.

Our Pennsylvania Superior Court has annunciated the criteria that must be established to satisfy due process:

> To satisfy due process, notice of a class action settlement must be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'

*Mullane [v. Central Hanover Bank & Trust Co.],* 339 U.S. 306, 314, 70 S.Ct. 652 [94 L.Ed. 865 (1950)] .... Although the notice need not be entirely comprehensive, the notice must not be misleading or materially incomplete. *Weinberger v. Kendrick,* 698 F.2d 61, 70 (2d Cir.1982). The notice must contain an adequate description of the proceedings written in objective, neutral terms that may be understood by the average absentee class member. *In Re Nissan Motor Corp. Antitrust Litig.,* 552 F.2d 1088, 1104 (5th Cir.1977). The notice also must 'contain information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment.' *Id.* at 1105.

*Wilkes v. Phoenix Home Life Mutual Insurance Company,* 851 A.2d 204, 211 (2004), *rev'd on other grounds,* 587 Pa. 590, 902 A.2d 366 (2006).

Here, abundant evidence established that PSU was adequately notified of the 2003 Petition proceeding.

First, Allegheny Power provided PSU with adequate notice through its customer bill inserts. PSU received approximately 100 of the inserts as a customer under the Tariff 39 accounts. The bill insert explained that "the proposed settlement would have the following effect" on the generation rate cap of Allegheny Power customers: "Generation rate protection through generation rate caps, which was to end in 2008, will be extended for two years until the end of 2010 to all customers...." [20] PSU Exh. No. 1; R.R. at 283a.

And as the ALJ astutely noted:

---

**20.** PSU argues that because it did not receive notice that clearly stated that the extended generation rate cap did not apply to the Tariff

37 account it was possible to conclude that PSU did not receive reasonable and adequate

*Having reviewed the bill insert, I find it was sufficient to give notice to Penn State [PSU]:* 1) that [the 1998] Restructuring Settlement was being amended; 2) that generation and distribution rate caps were going to be extended; 3) that the period for recovery of stranded costs was going to be extended; and 4) that the generation rate cap would increase in 2006, 2007, 2009 and 2010. . . . Had Penn State [PSU] representatives read through the notice, they would have realized the importance of the proposed amendment to the restructuring settlement (a very important document to which Penn State [PSU] was a signatory), *the extension of the stranded cost recovery period and the extension of the rate caps which would produce a concurrent rise in the generation cap (almost annually). At this point, (had the notice been read) the University [PSU] would have known it could be impacted by the case.* (Emphasis added and in original).

PUC Opinion adopting ALJ Recommended Decision at 37–38; R.R. at 1069a–1070a.

notice of the impact of the 2004 Petition. PSU Brief at 20, Fn. 13.

However, the ALJ rejected PSU's argument that the use of the term "all customers" was misleading and failed to properly notify PSU that the Tariff 37 account was not within the proposed generation rate cap extension:

The . . . flaw in Penn State's [PSU's] argument is its attempt to say that the language of the notices specified that the rate caps were extended for *all* customers somehow lulled the University [PSU] into believing that the extensions applied to Tariff 37, as well. My first problem with this argument is trying to conclude that Penn State [PSU] was mislead by language it never read. Mr. [Robert E.] Cooper [who was the Director of Energy and Engineering for the Office of the Physical Plant at PSU and was charged with the responsibility of authorizing payment of energy bills] testified that he did not read the bill inserts. . . . If Penn State

Second, Allegheny Power provided PSU with adequate notice when it published on September 25, 2004, the full text of the 2004 Petition in the *Pennsylvania Bulletin.* Allegheny Power Exh. No. GBB–4; R.R. at 596a, 602a. Appendix A listed the proposed rates that would apply to customers affected by the new capped generation rates for 2009 and 2010. *Critically, no rates applicable to PSU under the Tariff 37 account were included in Appendix A.* Appendix A made it clear that *the extended capped generation rates would only apply to Tariff 39 accounts and not to the Tariff 37 account.*

PSU's failure to remain diligent in reading the *Pennsylvania Bulletin* was its undoing. Again, as noted by the ALJ:

The Joint Petition as published in the *Pa. Bull.* provided an even clearer message. . . . Had Penn State [PSU] representatives read the . . . [*Pa. Bull.*] the title of the document [captioned 'West Penn Power Company Joint Petition for Settlement and For Modification of the 1998 Restructuring Settlement'] and the addition of the restructuring docket number would have alerted the Univer-

[PSU] did not know about the 2003 Petition, the 2004 Joint Petition and the contents of the bill inserts, then it could not have been confused by use of the words 'all customers.' I hasten to add that, due to the University's [PSU's] dual status as both Tariff 39 customers and a Tariff 37 customer, the words 'all customers,' were technically correct. Penn State [PSU] was properly included within the scope of 'all customers.' (Emphasis in original).

PUC Opinion adopting ALJ Recommended Decision at 37; R.R. at 1069a. The observations and logic of the ALJ is persuasive. As a result, this Court agrees that the notice given through the customer bill inserts did not mislead PSU into believing that the rate cap extension applied to the Tariff 37 account and it was adequate to provide notice to PSU of the importance of the proposed 2004 Petition to the 1998 Restructuring Settlement of which PSU was a signatory.

sity [PSU] that the restructuring settlement was being amended to change the rates and rate caps and that Appendix A contained a list of the proposed increases to the generation rate schedules for 2008, 2009 and 2010. . . . *At this point, the University [PSU] should have known that its rights were at risk. Even though none of the Appendices (A, B, C and D) noted in the text of the Joint Petition were included in the Pa. Bull., Penn State [PSU] was on notice to find a copy of Appendix A to learn more. If it had done so, it would have learned that the proposed changes to the rate schedules only impacted its Tariff 39 accounts and would have known that it had an opportunity to be heard on the subject of Tariff 37.* (Emphasis added). PUC Opinion adopting ALJ Recommended Decision at 38; R.R. at 1070a.

Therefore, the PUC properly concluded that pursuant to the customer bill inserts and the *Pennsylvania Bulletin* PSU "had reasonable notice of the scope of the 2003 Petition case and that its Tariff 37 rights could be impacted . . . [and] all of its due process rights were properly protected, and it failed to use its opportunity to participate in that case due to its own inactions. . . ." PUC Opinion adopting ALJ Recommended Decision at 36, 40; R.R. at 1068a, 1072a. Consequently, PSU was not denied due process.[21]

Accordingly, this Court affirms.

### ORDER

AND NOW, this 22nd day of January, 2010, the orders of the Pennsylvania Public Utility Commission, dated September 11, 2008, and December 9, 2008, are hereby affirmed.

### DISSENTING AND CONCURRING OPINION BY Judge COHN JUBELIRER.

Because I would conclude that The Pennsylvania State University (PSU) did not receive adequate notice that the 2004 Petition's rate cap extension would not apply to *all* of PSU's Tariff accounts, I respectfully dissent from Part V of the majority's opinion. In Part V, the majority concludes that the customer bill inserts sent by Allegheny Power and the publication of the 2004 Petition in the *Pennsylvania Bulletin* on September 25, 2004, provided PSU with adequate notice of the "Petition case and that its Tariff 37 rights could be impacted." *The Pennsylvania State University v. Public Utility Commission*, 988 A.2d 771, 783 (Pa.Cmwlth. 2010).

Adequate notice of a proceeding is required by the constitutional mandate for due process under both the United States and Pennsylvania Constitutions. *Wilkes v. Phoenix Home Life Mutual Insurance Company*, 851 A.2d 204, 210 (Pa.Super.2004), *rev'd on other grounds*, 587 Pa. 590, 902 A.2d 366 (2006). Our Supreme Court has stated that "[n]otice is the most basic requirement of due process." *Pennsylvania Coal Mining Association v. Insurance Department of Pennsylvania*, 471 Pa. 437, 452, 370 A.2d 685, 692 (1977). To satisfy due process, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them

---

**21.** PSU also argues that Allegheny Power had a financial interest in limiting the content of the notices to only the Tariff 39 accounts because Allegheny Energy Supply Company, LLC (Allegheny Energy), Allegheny Power's generation affiliate, could potentially gain over $9 million per year by selling electricity at market price as result of the removal of the Tariff 37 account from the capped generation rate for 2009 and 2010. However, PSU offered no evidence to demonstrate any collusion between Allegheny Energy and Allegheny Power to support its argument. Therefore, this Court need not address this issue.

an opportunity to present their objections." *Wilkes,* 851 A.2d at 211 (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). "Although the notice need not be entirely comprehensive, the notice must not be misleading or materially incomplete." *Wilkes,* 851 A.2d at 211. "The notice must contain an adequate description of the proceedings written in objective, neutral terms" and "must 'contain information that a reasonable person would consider to be material in making an informed, intelligent decision.'" *Id.* (quoting *In re Nissan Motor Corporation Antitrust Litigation v. Nissan Motor Company, Ltd.,* 552 F.2d 1088, 1104 (5th Cir. 1977)).

Contrary to the majority's holding, I would conclude that the customer bill inserts did not provide notice that was reasonably calculated, under all the circumstances, to apprise PSU that its Tariff 37 rates would be excluded from the rate cap extension. Allegheny Power included this bill insert in its September and October 2004 electricity bills notifying its customers, in relevant part, that:

> Generation rate protection through generation rate caps, *which was to end in 2008,* will be extended for two years until the end of 2010 to *all customers.* The generation rate caps for *all customers* increases each year between 2006 and 2010 to specified levels.

(Allegheny Power Customer Bill Insert, Reproduced Record (R.R.) at 286a (emphasis added).) Although the notice was technically accurate that it applied to all customers even if the Tariff 37 rates were excluded (because PSU has Tariff 39 accounts), I would conclude that the bill inserts were misleading as to what rates would be subject to the rate cape extension. Like the Tariff 39 accounts, PSU's Tariff 37 account was subject to "[g]enera-

tion rate protection through generation rate caps, which was to end in 2008." (Allegheny Power Customer Bill Insert, R.R. at 286a.) This notice does not differentiate between rates or tariffs and expressly states that the generation rate protection that would have ended in 2008, like the rate cap on PSU's Tariff 37 account, was being extended for two years for all customers. Given this very broad language, I would conclude there was no reason for PSU to inquire further into whether the rate caps on its Tariff 37 account, which were to expire in 2008, were included in the rate cap extension that applied to those generation rate caps ending in 2008.

Furthermore, I disagree with the majority that the text of the 2004 Petition, published in the *Pennsylvania Bulletin* on September 25, 2004, 34 Pa. B. 5326, provided adequate notice that PSU's Tariff 37 account was excluded from the 2004 Petition rate cap extension. The text of the 2004 Petition offers no indication as to which tariffs would be affected; rather, the 2004 Petition broadly states: "The period of the generation rate cap shall be extended from the end of 2008 through 2009 and 2010." 34 Pa. B. at 5326. As noted above, PSU's Tariff 37 rate cap, like the Tariff 39 rate cap, was scheduled to end in 2008. Appendix A, which was referenced in the text of the *Pennsylvania Bulletin* publication of the 2004 Petition and relied upon by the majority as support for its conclusion that PSU received adequate notice, was not published in the *Pennsylvania Bulletin.* However, a review of Appendix A reveals that, although it offers a detailed list of rate schedules, it makes *no reference to which tariff accounts* these rate schedules fall within.

I would, therefore, conclude that these notices do not contain an adequate description of the 2004 Petition written in objective, neutral terms that contain infor-

mation that a reasonable person would consider to be material in making an informed and intelligent decision. Accordingly, I dissent from Part V and concur with the remainder of the majority opinion.